## THE STATE v. BOWLES, *Appellant.*

### Division Two, November 7, 1898.

1. **Murder**: DEADLY WEAPON. Whether or not a knife is a deadly weapon is shown by the kind and effect of the wound inflicted with it.

2. ———: ———: EVIDENCE: NOT SEEN. Because no witness testified to seeing the knife, or detailed its exact dimensions, it can not be said there was no proof of its dangerous or deadly character.

3. ———: ———: INDICTMENT. It is not necessary to charge in an indictment that the murder was committed with a deadly weapon.

4. ———: PREMEDITATION. If defendant had time to think and intended to kill deceased, it was sufficient to establish premeditation in the eye of the law, if he had this intention for a minute, as well as an hour or a day, before he stabbed deceased.

5. ———: MANSLAUGHTER. If the deceased was the aggressor and by his blows aroused a sudden passion in defendant, and in the sudden quarrel defendant without malice or premeditation struck deceased with his knife and killed him, then defendant was guilty only of manslaughter in the fourth degree.

State v. Bowles.

6. ———: EVIDENCE: DYING DECLARATIONS. Where the preliminary inquiry clearly develops that the deceased was fully convinced that there was no hope of his recovery and so expressed himself, and died an hour later, his dying declarations should be admitted; but they should be confined to the identification of the prisoner as the perpetrator of the homicide, and the circumstances immediately attending it.

7. ———: ———: ACTS OF COMPANION. Where there is no charge of conspiracy or joint offense in the indictment, and no effort to connect another with the crime for which defendant was being tried, it is unnecessary to instruct the jury not to consider anything that the other said at the time of the difficulty as bearing upon the conduct of defendant.

8. ———: ———: DEFENDANT'S PHYSICAL CONDITION: SELF-DEFENSE. Defendant was indicted for murder in the second degree, for killing deceased with a knife. The evidence showed that deceased and defendant engaged in a fist fight at night in a public highway. Defendant claimed the killing was in self-defense; that deceased was a much heavier and stronger man than he was; that he had forced him back into a ditch at the side of the road, and that he stabbed deceased to prevent great bodily harm to himself. *Held* that the trial court erred in excluding evidence to the effect that at the time of the stabbing defendant was suffering with an acute disease affecting his nerves and especially his hip joint, was unable to perform ordinary manual labor, to ride horseback or to run or move out of a walk, and was bound, on account of these afflictions and to obtain relief, to take medicine by hypodermic injections.

*Appeal from Clinton Circuit Court.*—HON. C. A. ANTHONY, Judge.

REVERSED AND REMANDED.

*E. C. Hall* and *Witten & Hughes* for appellant.

(1) The instruction for murder in second degree was error in this case. (a) The elements of malice and premeditation are lacking. There can be no murder of either degree without malice and premeditation. *State v. Weiners*, 66 Mo. 13; *State v.*

*Mitchell,* 64 Mo. 191; *State v. Curtis,* 70 Mo. 594; *State v. Harris,* 73 Mo. 287. (*b*) This case at the very worst, upon the evidence for the State, could only be manslaughter in the third degree. *State v. Ellis,* 74 Mo. 207; *State v. Wilson,* 98 Mo. 440; *State v. O'Hara,* 92 Mo. 59; *State v. Branstetter,* 65 Mo. 149; *State v. Elliott,* 98 Mo. 150. (*c*) There can be no murder without an intention to kill. *State v. Wilson,* 98 Mo. 440; *State v. Gassert,* 65 Mo. 352; *State v. Peak,* 85 Mo. 191. There is no intention to kill here except such as might be inferred from the intentional stabbing in a vital part of the body of deceased. (*d*) It is true that where one intentionally stabs another in a vital part with a knife, which is a deadly weapon, the law will presume death to have been intended. But where one unintentionally stabs another in a vital part with a knife which is not shown to be a deadly weapon, the law will not presume death to have been intended. (2) If the homicide was intentional, and done in the heat of passion produced by lawful provocation, upon a sudden quarrel, and without malice and premeditation, then it was manslaughter in fourth degree. *State v. Davidson,* 95 Mo. 155; *State v. Watson,* 95 Mo. 415. (3) The court erred it admitting the dying declaration of deceased. *Rex v. Bedingfield,* 11 English Ruling Cases, 208. To make the declaration admissible, the declarant must not only have been dying, but must have known that he was dying. *Rex v. Mooney,* 5 Cox C. C. 318; *Rex v. Mackey,* 11 Cox C. C. 148; *Rex v. Howard,* 6 C. & P. 157; *Rex v. Wilburn,* 1 East P. C. 358; *State v. Draper,* 65 Mo. 335. It is essential to the admissibility of this kind of evidence that it appear that the declarant have a sense of religious responsibility. *Rex v. Pike,* 3 C. & P. 598; *Rex v. Perkins,* 9 C. & P. 395; *People v. Hodgdon,* 55 Cal. 72; *Dunn v. State,* 2 Ark. 229; *Tracy v. People,*

97 Ill. 101; *State v. Fenney*, 41 Kan. 115. (4) The court erred in excluding defendant's offer to prove by Dr. Stowers the physical condition of defendant. It was clearly competent in questions of self-defense. 1 Bish. Crim. Law [7. Ed.], sec. 873; *Hinch v. State*, 25 Ga. 699; *State v. Benham*, 25 Iowa, 154; *Fain v. Com*, 78 Ky. 183; Wharton's Crim. Ev. [9 Ed.], secs. 83 and 84.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *W. W. Graves*, for the State.

(1) The defendant and Jno. W. Shaver were together at the time of the difficulty. What was said by Shaver at the time of the difficulty was a part of the *res gestae*, and properly admitted. Gillett on Indirect and Col. Ev. [Ed. 1898], sec. 290; Underhill on Crim. Ev. [Ed. 1898], sec. 101; *State v. Gabriel*, 88 Mo. 631; *State v. Kaiser*, 124 Mo. 657. (2) (*a*) The court committed no error in giving the instruction for manslaughter in the fourth degree. The evidence justified such an instruction from several standpoints. *State v. Hermann*, 117 Mo. 629; *State v. Gilmore*, 95 Mo. 554. (*b*) Defendant can not complain of this instruction, however, as he was not convicted of manslaughter in the fourth degree. *State v. Sansone*, 116 Mo. 1; *State v. Alfrey*, 124 Mo. 393. (3) The court properly instructed on manslaughter in the fourth degree. Under the evidence, the act was either murder, manslaughter in the fourth degree, or justifiable homicide in self-defense. *State v. Petit*, 119 Mo. 410; *State v. Partlow*, 90 Mo. 608; *State v. Gilmore*, 95 Mo. 554; *State v. Rapp*, 142 Mo. 443. (4) There was no error in admitting the dying statement of deceased. The State proved that the deceased was anticipating

immediate dissolution.  *State v. Elkins*, 101 Mo. 344;
*State v. Evans*, 124 Mo. 397.

GANTT, P. J.—The defendant was indicted for
murder in the second degree of Hugh Hall, in Clinton
county on the sixth of March, 1897, and was convicted
as charged.

No error is assigned or perceived in the record
proper.

The evidence, briefly stated, establishes that the
homicide occurred near a small village called Lilly.
There are two stores in the place.  The deceased was
a clerk in one and defendant in the other.  There is
no evidence of ill-feeling between the two prior to the
night of the homicide.

On that night the deceased, Hall, and several
others in the spirit of a joke made a scarecrow, by
cutting openings for a human face in a paper box and
placing a lamp inside, for the purpose of frightening
John Shaver, the proprietor of the store in which de-
fendant clerked, and one Atcheson, a young man visit-
ing in the neighborhood.  Shaver lived on his farm
about one half of a mile north of Lilly.  Having con-
structed their scarecrow, the deceased and his party,
about 9 o'clock that night, went up the road lead-
ing from Lilly to Shaver's house about a quarter of a
mile, and placed the scarecrow in a hedge fence on
the east side of the road.  Opposite to this place was
a haystack in a field across the road.  Two of the
party went into an adjoining cornfield, and the deceased
and others  went behind the haystack to await the
coming of Shaver and Atcheson.

About 9 o'clock that evening Shaver closed his
store, and he and the defendant, Bowles, started to
his home, together, up the said public road, Shaver
riding a pony and defendant walking.  The night was

dark and cloudy. . When they reached the point in the road where the scarecrow had been placed in the hedge fence, Shaver discovered it and shot at it with his pistol. Thereupon the young men in hiding all laughed and indicated their hiding place.

Shaver said to defendant, ''There they are behind the haystack; you shoot them on that side, and I will shoot the sons of bitches when they come around on this side.'' The deceased was then on top of the stack and rose up and said, ''Shoot me if you wish.'' After a wordy altercation deceased came down and being asked, said he had put up the scarecrow. Defendant thereupon said, ''Hugh, you ought not to have put that there; it might make trouble.'' A quarrel ensued and resulted in a mutual rencounter between deceased and defendant with their fists. According to the defendant's evidence deceased struck him first with his fist, but it was dark and the witnesses could not state definitely which struck first, but both were engaged in it.

The fight continued between these two until defendant was forced or knocked back to the ditch on the side of the road, when defendant was seen to strike deceased with a swinging lick, and as he did, Hall, the deceased, cried out, ''He has a knife; he has stabbed me and stabbed me bad,'' and leaned or fell against a post. He began to sink down, and was caught by some of his companions, and laid on the ground. One of the party immediately went after a physician. Defendant's evidence tended to show that deceased was striking him when the fatal stab was given, and that defendant had seen deceased make a motion toward his pocket as if to get a weapon, but that it was so dark defendant could not see whether he had anything in his hand.

On the other hand the State's evidence tended to show that before the fatal blow was given, the combatants had ceased fighting for a few moments, and deceased was standing still, and his hands had dropped to his side, when defendant suddenly sprang forward and stabbed him.

The wounded man was taken back to the store, and when the physician came, it was ascertained that deceased had been cut in the right groin. The wound had been inflicted by a sharp instrument. It cut through two parts ligament, severed the illiac artery, and cut through the peritoneum. The physicians testified that the wound was in a vital part, and this wound necessarily fatal. The body of deceased was examined that night and no weapon found upon him, and the State's witness testified he made no attempt to use any in the fight.

On the part of defendant, he and his brother testified to finding an open knife next morning near the place of homicide, which they identified as either belonging to defendant or being very similar to one he usually carried. This evidence in turn was rebutted by the State.

I.   The first, and we think the most serious, contention of the learned counsel for defendant, is that under the facts there is no murder in the case, and it was error to instruct upon the elements of murder in the second degree, as was done by the circuit court.

The propriety of this charge depends upon the law. In this State it has been uniformly and consistently adjudged that when one intentionally stabs another in a vital part with a deadly weapon, the law presumes that he intended the natural consequences of his act, and from the use of the deadly weapon the existence of malice may be inferred, and he will be guilty of murder in the second degree in the absence of qual-

ifying or mitigating circumstances, or of proof of circumstances showing deliberation.

The learned counsel concedes that abstractly stated this is the law, but insists that it has no application to the facts disclosed on the trial of this case, for the reason that it was an *unintentional stab* and the weapon was not shown to be a deadly weapon.

The first contention is out of the question. The whole evidence shows that defendant purposely and intentionally stabbed deceased. His own testimony unequivocally establishes that fact. The character of the knife with which defendant did the stabbing was shown by the nature of the wound inflicted with it. There was ample evidence in the description of the wound, and its effect to demonstrate that the knife used was a deadly weapon.

A deadly weapon is any weapon or instrument by which death would likely be produced, when used in the manner in which it may appear it was used in the affray. It needs no argument to prove that a knife capable of inflicting a wound of the dimensions and depth shown in this record, and in a vital part of a grown man, was such a weapon as the law denominates deadly or dangerous. It does not follow because no witness testified to seeing the knife, or detailed its exact dimensions, there was no proof as to its dangerous or deadly character. The deadly effect it produced was confirmation strong of its lethal qualities. There is no evidence to indicate that the blow in the vital part of deceased was in any sense the result of accident, or was unintentional. *Harris v. State*, 34 Ark. 469; *People v. Rodrigo*, 69 Cal. 601.

By the discussion as to the character of the weapon used we are of course not to be understood as intimating that it is necessary to charge in an indictment that a murder was committed with a deadly

weapon. On the contrary, it is clear that it is not at all necessary to so charge. *State v. McDaniel*, 94 Mo. 301; 2 Bish. Crim. Proc. [3 Ed], sec. 514; *State v. Hyland*, 144 Mo. 302.

We have been dealing only with the presumption arising from the use of a deadly weapon, and the sufficiency of the evidence in this case, to establish that the knife, with which the homicide was effected, was a deadly weapon. Finally, upon this point, is the case so wanting in circumstances tending to show malice that the trial court, and this court can say as a matter of law upon the whole evidence, that there was no evidence of murder, and that issue was erroneously submitted to the jury?

While it was eminently proper to instruct the jury as to manslaughter in the fourth degree, it does not follow that the court erred in submitting to the jury, under the evidence, whether the stabbing was not with malice.

The common law implied malice in every unlawful killing, and the burden of proof of extenuating circumstances, unless they arose out of the evidence against the defendant, lay on him. *State v. Dunn*, 18 Mo. 419. That there was evidence that this homicide was the result of a quarrel may be admitted, and yet, from other testimony, the conduct of the defendant might be characterized as indicating a heart fatally bent on mischief.

There was absolutely nothing in the mere hanging of the scarecrow in the hedge to give any reasonable man any provocation for assaulting the perpetrator of such an antiquated and innocent joke, and yet the uncontradicted testimony is that Shaver and defendant both indulged in the most offensive oaths and epithets to the deceased because of his participation therein, Shaver even threatening to shoot him. It is

altogether probable that but for the very insulting epithets applied to deceased and his companions by Shaver and defendant, no difficulty whatever would have occurred. There was evidence that the defendant was admonished three times by deceased to keep his hands off of him, thus indicating that the defendant was the aggressor, and from which the jury might have inferred that defendant went into the rencounter with deceased, with the knife in his hands, and stabbed him after deceased had ceased to fight. The evidence is quite conclusive that deceased at no time used or attempted to use any weapon, and that defendant in the dark did purposely use a deadly weapon upon deceased.

Upon the whole, we think there was sufficient evidence upon which to submit to the jury the question of malice and premeditation. It is not at all necessary for defendant to have preconceived the crime before starting up the road that night. If with no more provocation and justification than the finding of a scarecrow in the hedge he began to abuse the deceased, and assaulted him until he provoked him to a fist fight, and had time to think and intended to kill deceased, it was sufficient if he had this intention for a minute, as well as an hour or a day before he stabbed him, to constitute premeditation in the eye of the law.

As already said, if the jury found the other alternative, to wit, that deceased was the aggressor and by his blows aroused a sudden passion in defendant, and in the sudden quarrel defendant without malice or premeditation struck deceased with his knife and killed him, then it was only manslaughter in the fourth degree.

II. Defendant assigns as error the admission of the dying declarations of deceased. The objection was that these statements were not made under a sense of

immediate dissolution.   We think the preliminary inquiry clearly developed that the deceased was fully convinced that there was no hope of his recovery and so expressed himself.   In fact he died an hour later. The circuit court was exceedingly careful to elicit all the circumstances before admitting the testimony, and we think was fully justified in admitting the dying declarations.   Their competency otherwise is not questioned.   They related only to the identification of the prisoner as the perpetrator of the homicide, and the circumstances immediately attending it, thus bringing them within the conservative rule announced in 1 Greenleaf on Evidence, section 156, so often approved and followed in this court.   *State v. Draper*, 65 Mo. 335 and subsequent cases.

III.   Counsel for defendant requested the court to instruct the jury that they could not consider anything said by John W. Shaver at the time of the difficulty as bearing upon the conduct of defendant.

There was no charge of conspiracy or joint offense in the indictment, and no effort to connect Shaver with the crime for which defendant was being tried, and the instruction was unnecessary.   The court in its discretion might have given it without committing error, but it was not reversible error to refuse it.

IV.   There was no error in the eleventh instruction given by the court on the law of self-defense.   It was such as has often met the approval of this court.

V.   The defendant called Dr. Stowers and proved by him that he knew the defendant and had treated him professionally for the past two years.

Defendant then offered to prove by this witness that the defendant at the time of the difficulty charged in this indictment was suffering from acute disease affecting his nerves and especially his hip joints, and that the defendant was unable to perform ordinary

manual labor, unable to ride horseback, was bound continually to take medicine by hypodermic injections for the purpose of allaying the intense pain caused by this affliction, and was unable to run or to move out of a walk on account of this affliction.

The court sustained an objection to this evidence, and the defendant duly excepted.

One of the principal defenses in this case was self-defense. It was urged by defendant that the deceased was a much heavier and stronger man than defendant; that deceased had forced him back into the ditch and he stabbed him to prevent great bodily harm. Upon that theory the court instructed the jury.

Under such a state of facts it seems to us that evidence tending to show great disparity in the physical condition of the two combatants was of prime importance to defendant. If defendant was suffering from an acute affliction of the hip joint which forbade his retreat or rendered him utterly powerless to resist the onslaught of deceased, certainly it would have gone far with the jury to excuse his use of a knife on his assailant, if such they believed the deceased to have been. Such evidence is uniformly held admissible in cases of this character.

In *Selfridge's* case, Wharton on Homicide, appendix number 1, Chief Justice PARKER expressly charged: "You must make up your mind from all the circumstances proved in the case such as the rapidity and violence of the attack, the nature of the weapon with which it was made, the place where the catastrophe happened, the *muscular debility or vigor of the defendant and his power to resist or fly.*"

In that case evidence was received of the defendant's debility and this was considered one of the chief points for the jury to consider, whether danger to the

defendant was apparent. *Fain v. Com.*, 78 Ky. 183; *Hinch v. The State*, 25 Ga. 699; *State v. Benham*, 23 Iowa, 154; 1 Bishop's New Crim. Law, sec. 873; Wharton's Crim. Ev., secs. 83 and 84.

Error is presumptively harmful. It is only when we can say that it clearly worked no injury that it can be said to be harmless. In a mutual rencounter such as this record discloses, it can not be maintained that a fact so patent as the diseased condition of defendant could be excluded from the consideration of the jury without injury to his defense.

The case was otherwise carefully and well tried, but for the exclusion of this evidence it must be and is reversed and remanded. SHERWOOD and BURGESS, JJ., concur.