THE STATE v. JOHN R. DUNN, Appellant.

Division Two, June 8, 1909.

1. **DEADLY WEAPON: Assumed in Instruction.** The instruction in assuming that "a heavy piece of wood or club" was a deadly weapon was not erroneous in view of the fact that the indictment specifically described in detail a piece of wood that was a deadly weapon *per se*, and the evidence shows that the deceased was killed with the identical piece of wood described in the indictment.

2. **HOMICIDE: Self-Defense: Voluntarily Entering Difficulty: Instruction.** An instruction telling the jury that if "defendant voluntarily entered into the difficulty which finally resulted in the striking and killing of said deceased, or that he voluntarily and of his own free will became engaged in such difficulty with the intention of killing or of doing some great bodily harm to said deceased, then and in that case you are not authorized to acquit defendant on the ground of self-defense; . . . and this is true no matter how violent the defendant's passions became or howsoever hard he may have been pressed during the progress of the affray between himself and deceased; or how imminent his peril might have become during the affray so brought about," is correct, except as to faulty punctuation.

3. **INSTRUCTION: Qualifying Clause.** No qualifying clause in an instruction should be disconnected from the part it is intended to modify and of which it is a component part.

4. **HOMICIDE: Self-Defense: Entering Difficulty: Limitation.** The testimony showed that about an hour before the homicide defendant said to deceased, "I ought to knock your head off; but you are an old man and I won't hurt you." An intelligent little girl nine years old testified that when she first saw defendant he was throwing rocks at deceased, who was then lying flat on the ground; that she then saw defendant take

State v. Dunn.

off his coat, procure a club and begin beating deceased on the head. The club was procured and blood was upon it. Defendant testified that deceased struck him five or six times in the face with his fist and made his nose bleed, but he bore no signs of this or other physical injury. *Held*, that the court did not err in limiting defendant's self-defense to a voluntary entering into the difficulty, etc., but the instruction, being based on defendant's testimony alone and that of the most flimsy and shadowy kind, was a concession to him.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

AFFIRMED.

*Thomas B. Harvey* for appellant.

(1) The court erred in not permitting defendant, on cross-examination of Ida Bunting, to ask her questions regarding her testimony before the grand jury, for the purpose of impeachment. R. S. 1899, sec. 2506; State v. Thomas, 99 Mo. 235; State v. Whelehon, 102 Mo. 17; Little v. Com., 25 Gratt. (Va.) 921; U. S. v. Smith, 47 Fed. 501; Dean v. Com., 78 S. W. 1112; Davis v. State, 122 Ga. 564; Simpson v. State, 46 Tex. 551; Morton v. State, 43 Tex. Cr. 533; Clanton v. State, 13 Tex. App. 139; Bressler v. People, 117 Ill. 422; Com. v. Mead, 78 Mass. 167; Scott v. State, 23 Tex. App. 521; Rippey v. State, 29 Tex. App. 37. (2) The second instruction is erroneous in assuming that a "heavy piece of wood" is a deadly weapon, and in telling the jury that from its use they may infer an intent to kill, and not requiring the jury to find the fact that it is a deadly weapon. State v. Myers, 198 Mo. 264. (3) The instruction on self-defense is fatally bad in warning the jury that that defense was of no avail if defendant voluntarily entered into the quarrel, or if he brought it on with felonious purpose against the deceased,—there being no evidence as a basis for such propositions. State v. Edwards, 203 Mo. 539; State v. Smith, 125 Mo. 2; State v. Walker, 196 Mo. 85; State

v. Chambers, 87 Mo. 406; State v. Herrell, 97 Mo. 105. (4)   The right of self-defense is not forfeited by the mere fact that one "voluntarily entered into the difficulty," or because "the difficulty is sought for or induced by the party's own wilful act."    State v. Partlow, 90 Mo. 608; State v. Edwards, 203 Mo. 54; State v. Gordon, 191 Mo. 114.   And even if the evidence justified an instruction on the subject of provoking or voluntarily bringing on the difficulty, the jury should have been advised what was meant by these terms. State v. Gordon, supra; State v. Edwards, 203 Mo. 542.

*Elliott W. Major*, Attorney-General, and *John M. Atkinson*, Assistant Attorney-General, for the State.

(1)   The court properly overruled the demurrer offered by appellant at the close of the testimony in chief by the State.   The circumstances and facts proved by the State in its testimony in chief pointed strongly to appellant's guilt, and such facts and circumstances were for the jury to pass on, and the court properly submitted them to the jury.   State v. George, 113 S. W. 1118; State v. Dilts, 191 Mo. 665; State v. Miller, 191 Mo. 587; State v. Dusenberry, 112 Mo. 293; State v. Macks, 140 Mo. 656.   (2)   The court only excluded the cross-examination of the witness, Ida Bunting, by counsel for appellant, for the time being.   Appellant did not renew a further cross-examination on the same subject.   This was  not error by the court. State v. Arnold, 206 Mo. 589.   (3)   Appellant does not indicate in the record what he expected the answer of each question asked said witness, Ida Bunting, would be, and for that reason the assignment of error cannot be reviewed by this court.   State v. Arnold, 206 Mo. 597; Bank v. Aull, 80 Mo. 199; Jackson v. Hardin, 83 Mo. 175; State v. Martin, 124 Mo. 523; State v. Hodges, 144 Mo. 55.

BURGESS, J.—The defendant was prosecuted under an indictment charging him with murder in the first degree, for the killing of one John Cook, with a heavy stick or club, on the evening of January 9, 1907, in the city of St. Louis, and was convicted of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of ten years. Having filed motions for new trial and in arrest of judgment, which were overruled by the court, defendant appealed.

Deceased, John Cook, who was nicknamed "Blackie," and the defendant were seen together, drinking, at Morische's saloon, called the Bellevue, located at 5000 Easton avenue, in the city of St. Louis, on the afternoon of January 9, 1907, both being under the influence of liquor. Cook had been employed doing odd jobs or chores in and about the saloon, and had a "bunk" or sleeping place in a shed back of the saloon. He was about fifty years of age, his hair being slightly gray, and he weighed over 170 pounds. The defendant was past twenty-one years of age at the time of the homicide, and for some eight or nine months had been a constant frequenter of this and other saloons. On the evening in question, while the two men were drinking at a table in the saloon, the bartender heard the defendant say to deceased, "Blackie, I ought to knock your head off; you are an old man, and I wouldn't hurt you;" but on cross-examination, the witness explained that he did not attach any importance to the remark, as he had often heard the defendant make remarks of that character in jest, and that the defendant, after saying that, called the deceased to the bar of the saloon and they had a drink together, the defendant paying for the same. The defendant, at the time, was noticed wearing a white sweater under a black coat, and had on a derby hat. About 5:15 o'clock, on said afternoon, both men were observed leaving the saloon, and the evidence is that they pro-

ceeded to another saloon located at 1407 King's High-way, between Wells and Ridge avenues, and kept by one Mike Francesconi. This saloon was about one and one-half blocks from the Morische saloon, and was close to an alley, on the northwest of which was a stoneyard used for the purpose of dressing stone. The defendant and deceased arrived at the Francesconi saloon about 5:20 o'clock that afternoon, ordered some drinks, the defendant paying for same, and soon afterwards left the saloon together through the door next the alley. About 7:15 o'clock, on said evening, the body of the deceased was found in said alley, and lying between fifty and seventy-five feet from the mouth of the alley at King's Highway. There was much mud in the alley where the body was found. Near the head was a pool of blood, and a few feet distant was found a piece of 2 by 4 scantling, about two feet in length, with blood on it. The deceased had two deep wounds on the left side of his head, and one on the right side near the ear, from which blood was still flowing, and from which he died. The cuts were apparently done by some dull instrument, and the skull was fractured. He was dead when found. The defendant returned to the Francesconi saloon, alone, about half an hour after the time he left it in company with the deceased. To Dr. Heitzig, a dentist, and some others in the saloon, he showed his hands the backs of which were scratched and bleeding a little, and mentioned something about somebody "trimming" him. He then sat down at a table in the saloon, and apparently went to sleep, his head resting on his arms, and was shortly thereafter arrested by the officers. On the way to the police station Officer Lawler asked the defendant what was the trouble between him and "Blackie," and he answered, "Oh, Blackie tried to take a soak at me," but refused to say anything further at that time. At the police station he explained that he and Blackie had been drinking at the Francesconi saloon, that they

then started back to the Morische saloon, and that Blackie left him at the entrance to the ''grove,'' saying he was going to his bunk, and that he, defendant, then went into the Morische saloon for another drink, afterwards returning to Francesconi's saloon, where he was arrested. On being questioned more closely, he refused to make any further statements, saying he wanted to consult his attorneys and see his father before talking further. His garments were taken off and examined, and on the hat, coat, sweater, pants and handkerchief so examined was found what appeared to be fresh blood, and his outer garments and shoes had mud on them. The right hand of defendant was swollen, and a streak of blood was found on the palm, and the upper part of one of his ears was bruised and discolored. It does not appear that the defendant, before his trial, which occurred some ten months after the killing, made any statement as to how the killing occurred. The morning after the deceased was found in the alley other pieces of scantling, like to that which was found the evening before with blood thereon, were discovered in the stone yard, said pieces being used in connection with the work in the stone yard.

The only direct testimony as to the killing, aside from that of defendant himself, was that given by Ida Bunting, a little girl, between nine and ten years of age who lived at 5025 Ridge avenue. She testified that as she was returning from an errand to a butcher shop at Easton and Academy avenues, about 5:30 o'clock on said evening, and while crossing a vacant lot on which was the stone yard, at the rear of Francesconi's saloon, she saw a young man throwing stones at an old man who was lying in the mud in the alley; that thereafter the young man took off his coat and picked up a club with which he beat the old man on the head; that she observed that the young man wore something white, and that she told her mother as soon as she got home about what she saw.

Defendant testified that after he and the deceased left the Francesconi saloon, that evening, and started towards Morische's saloon, the deceased, on reaching the gateway leading to Morische's garden, left the defendant, saying, "I am going to my bunk and go to sleep;" that he, defendant, said, "I am going in to have another drink, and then I am going down to Mike's (meaning Francesconi's) and from there home;" that he, defendant, then went into Morische's saloon and took a drink, and immediately started back, on King's Highway, to Francesconi's; that on leaving the Morische saloon he met a Mr. Crump, who walked with him to Wells avenue, where they parted; that defendant said to Crump, "Before you go home, why not come down to Mike's and have a drink with me," but that Crump, who was in a hurry to get home, declined his invitation; that he then started towards Francesconi's saloon, and just as he passed the foot of the alley, near the saloon door, the deceased, who was standing at the corner of the alley, said to him, "Come here, kid;" that deceased grabbed and pulled him into the alley, and they grappled and fought each other, moving back in said alley a distance of some seventy-five feet; that deceased struck him on the head and knocked him down, and as he fell down the deceased said, "Damn you, I got you now, and I will kill you;" that defendant picked up a club which he saw on the ground, and that about the same time deceased picked up another club and struck at the defendant and knocked off his hat; that the deceased continued to advance, and that he, defendant, struck deceased twice with his club, knocking him down, and that he then threw the club away and went into Francesconi's saloon. He denied that he struck the deceased after he was down, and claimed that it was necessary for him to strike him as he did in order to save his life. In explanation of the blood found on his handkerchief, he stated that he was bleeding at

the nose at the time he left the alley, and used the handkerchief to remove it, but there is no evidence that anybody at the saloon to which he returned noticed his nose bleeding, or that he made any reference to it.

William D. Morische, son of the saloon-keeper of that name, testified for the defendant that on the morning of the day before the killing a controversy arose in the saloon between the defendant and the deceased about drinks; that defendant accused "Blackie" of being a thief, and that "Blackie" challenged him to prove it, whereupon the two men, with Morische, went to the shed where "Blackie" slept, and there they discovered a bottle of whiskey which the defendant charged "Blackie" with stealing; that "Blackie" became very angry, and said to defendant, "I will get even with you for this—I will get you some night alone."

Matthew Peacock, bartender in Morische's saloon, testified that the defendant came into that saloon about seven o'clock on the evening of the killing, and drank there; but this testimony, as to the time he was in said saloon, is totally at variance with the testimony of the defendant and many other witnesses.

There was testimony that the defendant was a member of a church society, and bore a good reputation for peace and quiet, but none of the witnesses so testifying had any knowledge of defendant's dissipated habits, as shown by his own testimony and that of other witnesses.

The record discloses that Ida Bunting, who testified as a witness for the State at the trial of this cause, was also a witness before the grand jury which preferred the indictment. A portion of her testimony upon her cross-examination by defendant's counsel, was as follows:

"Q. You said a while ago you went home and told your mother about it? A. Yes, sir. Q. And

Mrs. McLain was there, too wasn't she? A. Yes, sir. Q. Did you tell her about it, too? A. No, sir, but she came in that night. Q. She came in? A. Yes, sir; she was in when I told mamma. Q. Didn't you tell them you saw the men fighting? A. No, sir. I didn't say that. Q. You didn't say that; and you were before the grand jury, were you? A. Yes, sir. Q. Up in a room in this building, didn't you tell them you saw them fighting—saw the men fighting in the alley? A. No, I never saw them fighting. Q. You never saw the man at all before he was laying down on his face on the ground? A. No, sir. Q. Is that your statement, that you didn't see him at all before he was lying down flat on the ground? A. He was down all the time I saw him.''

Further on, during the cross-examination of the witness, the following occurred:

''Q. You say you didn't tell the grand jury you saw these men fighting?

''Counsel for the State objects to this testimony; objection sustained; defendant's counsel duly excepts.

''Q. You remember you were up before the grand jury, you said? A. Yes, sir.

''MR. HARVEY: I want to ask her if she didn't tell the grand jury a certain thing.

''MR. NEWTON: I don't think it is proper to go into the question of her testimony before the grand jury here.

''THE COURT: The objection will be sustained for the present.

''Defendant's counsel at the time duly excepts to the ruling of the court.''

Defendant contends that the witness did not answer the question as to whether she didn't tell the grand jury that she saw the two men fighting in the alley, but that she evaded it, and that the court erred in not requiring her to answer the question directly.

When the answer of the witness to this question is considered in the light of, and in connection with, her previous testimony, and fairly construed, it can hardly be conceded that her said answer was evasive. Counsel for defendant had previously asked her if she did not tell her mother and a Mrs. McLain that she saw the men fighting. Her answer was, "No, sir, I didn't say that." "Q. You didn't say that—and you were before the grand jury, were you? A. Yes, sir." Further on, the witness testified that she never saw the man (deceased) before she saw him lying down on his face on the ground.

If the witness, in answering the question particularly alluded to, had stopped after saying "No," this would have been a complete answer to the question, but after saying "No," she inadvertently added, "I never saw them fighting." It is plain that what the witness intended to say was that she did not, before the grand jury, nor elsewhere, state that she saw the men fighting. That this was also the view of counsel for defendant is implied from the question asked by him of the witness, in these words, "You say you did not tell the grand jury you saw these men fighting?" Following this, the question was asked, "You remember you were up there before the grand jury, you said? A. Yes, sir." Counsel for defendant then said to the court, "I want to ask her if she didn't tell the grand jury *a certain thing.*" To this objection was made, and sustained. What counsel intended to ask the witness was not stated by him, and the court properly sustained the objection. To hold that the answers of the witness to the questions propounded to her were not sufficiently direct to constitute a foundation for her impeachment, had it been desired to introduce testimony for that purpose, would, we think, be unwarrantable. For a child of her years, this witness was very intelligent,

and her testimony throughout is clear, candid and consistent.

The second instruction given by the court reads as follows:

"The court instructs the jury that he who willfully, that is, intentionally, uses upon another at some vital part, a deadly weapon, as a heavy wooden club, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and, knowing this must be presumed to intend death, which is the probable and ordinary consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart. If, therefore, the jury believe from the evidence that the defendant took the life of John Cook by striking him in a vital part with a heavy piece of wood or club, with a manifest design to use such weapon upon him, and with sufficient time to deliberate and fully form the conscious purpose to kill, and without sufficient cause, or reason, or provocation, then such killing is murder in the first degree."

It is objected by defendant that this instruction is erroneous and prejudicial, in that it assumes that "a heavy piece of wood or club" is a deadly weapon, and that if the defendant struck and killed the deceased with a heavy piece of wood, or club, he will be presumed to have intended death.

"A deadly weapon is one likely to produce death or great bodily injury, and the manner in which it was used in the particular instance may enter into the question whether or not it was deadly. Commonly the question of what is a deadly weapon is deemed to be of law for the court, not of fact for the jury. Yet it may so far involve a fact as to be in effect for the jury; for example, where it is deadly or not according to the manner of its use." [2 Bishop's New Crim. Law, sec. 680.]

The indictment charges that the defendant, "with force and arms in and upon one John Cook, in the peace of the State then and there being, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did make an assault; and that the said John R. Dunn, with a dangérous and deadly weapon, to-wit, a heavy piece of wood, of the length of twenty-two inches, of the breadth of three and one-half inches and of the thickness of one and three-quarters inches, him, the said John Cook, in, upon and about the head and body of him the said John Cook, then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did strike, beat and wound, giving to the said John Cook, at the time and place aforesaid, with the dangerous and deadly weapon, to-wit, the piece of wood aforesaid, in the manner aforesaid, in and about the head and body of him, the said John Cook, several mortal wounds and fractures of the skull, of which said mortal wounds and fractures of the skull, the said John Cook, then and there, at the said city of St. Louis, instantly did die," etc.

The evidence showed very conclusively that the deceased was killed by the defendant with the identical club described in the indictment. No one of ordinary intelligence would hesitate for a moment in concluding that the club in question, in the manner in which it was used upon the deceased, was a dangerous and deadly weapon. As was said in Hamilton v. People, 113 Ill. l. c. 38, "such things as all persons of ordinary intelligence are presumed to know are not required to be proven." [State v. Drumm, 156 Mo. 216; State v. Shields, 110 N. C. 497; State v. West, 6 Jones' Law (N. C.), 505; State v. Rigg, 10 Nev. l. c. 290; State v. Phillips, 104 N. C. 786.] The court did not err in assuming that the club in question was a dangerous and deadly weapon. Moreover, we are of the opinion that the club as described in

the indictment in this case was a dangerous and deadly weapon *per se.*

The following portion of the court's instruction upon self-defense is claimed to be erroneous, the features particularly objected to being in italics:

"The law of self-defense is emphatically the law of necessity, and does not imply the right of attack; nor will it avail in any case where the difficulty is sought for or *induced by the party's own willful act, or where he voluntarily and of his own free will enters into it with the intention of killing or of doing some great bodily harm to the person so entered into controversy with, no matter how imminent the peril may become during the progress of the affray; nor will any mere words or epithets, though vile and insulting,* or any threats or insults made at sometime prior thereto, justify making of an assault; and you are further instructed that no one is justified in using any more force than is necessary to get rid of an assailant or to repel an assault made upon him; nor in the use of a deadly weapon to repel an assault, unless at the time there be good cause to apprehend death or great bodily injury from such assault.

"If, therefore, you do believe and find from all the evidence in the case either *that the defendant voluntarily entered into the difficulty which finally resulted in the striking and killing of said John Cook, or that he voluntarily and of his own free will became engaged in such difficulty with the intention of killing or of doing some great bodily harm to said Cook;* or that after the said Cook had been thrown to the ground and the defendant was no longer in danger of an assault or of great bodily harm at the hands of said Cook, the defendant persisted in striking, wounding and killing said Cook, then and in that case you are not authorized to acquit the defendant on the ground of self-defense; *and this is true no matter how violent* the defendant's passions became or *how hard*

*soever he may have been pressed during the progress of the affray between himself and the deceased; or how imminent his peril might have become during the affray so brought about."*

The only fault of this instruction is in its punctuation, which is not absolutely correct. In some places in the last paragraph semicolons are used instead of commas, and in one or two other places the sentence might be improved by the insertion of a comma. The meaning, however, is clear enough and it is not intimated that the jury misunderstood it.

The phrase, in the first sentence, *"Nor will it avail in any case where the difficulty is sought for or induced by the party's own willful act"* and the phrase, *"Or, where he voluntarily and of his own free will enters into it,"* are both qualified by the phrase, *"with the intention of killing or of doing some great bodily harm to the person so entered into controversy with."* [State v. Bailey, 190 Mo. 1. c. 286.] In the last paragraph of the portion of the instruction quoted it will be seen that the phrase, *"Either that the defendant voluntarily entered into the difficulty which finally resulted in the striking and killing of said John Cook,"* and the phrase, *"Or that he voluntarily and of his own free will became engaged in such difficulty,"* are both qualified by the phrase, *"with the intention of killing or of doing some great bodily harm to said John Cook."* [State v. Bailey, supra.]

This instruction is the law of this State, and has been since the decision known as the Partlow case. [State v. Partlow, 90 Mo. 1. c. 608; State v. Gordon, 191 Mo. 1. c. 124; State v. Feeley, 194 Mo. 1. c 322; State v. Vaughan, 141 Mo. 1. c. 521; State v. Lewis, 118 Mo. 1. c. 84; State v. Bailey, supra, and many other cases.]

The defendant insists that the instruction is fatally wrong in telling the jury that "such defense will not avail in any case where the difficulty is sought for

or induced by the party's own willful act;'' and also in telling them that such defense could not be pleaded if ''the defendant voluntarily entered into the difficulty which finally resulted in the striking and killing of said John Cook, . . . no matter how imminent his peril might have become during the affray so brought about.'' What we have said above is a full answer to the latter objection. The defendant, however, by quoting only a small part of the sentence, and omitting one of its essential elements, does not deal fairly with the instruction. The phrase left out is, ''with the intention of killing or of doing some great bodily harm to said John Cook.'' It will not do to single out for criticism one of the constituents of a sentence, without any reference to its other components, by which the first is qualified, and with which it should be connected in order to bring out the full and true meaning of the author. We have no doubt, however, that the omission was wholly unintentional or inadvertent.

A further contention is that there was no evidence tending to show that the defendant sought the difficulty, or brought it on, and that there was, therefore, no basis for the limitation of the defendant's right of self-defense imposed by the instruction.

The testimony of Ida Bunting is that when she first saw the defendant he was throwing rocks at the deceased, who was then lying flat on the ground; that she then saw the defendant take off his coat, procure a club, and begin beating the deceased on the head. The blood and wounds on the deceased, and the blood on the club which the defendant used, as well as the defendant's almost total freedom from physical injury, all strongly indicate that the deceased was not the aggressor, and that if there was a struggle at all, it was very onesided. The testimony shows that the defendant, about one hour before he killed the deceased said, ''Blackie, I ought to knock your head off;

State v. Dunn.

but you are an old man, and I wouldn't hurt you." Aside from the defendant's own testimony, there was absolutely no proof that the deceased began or entered into any difficulty with the defendant, or that he used a club upon him. A police officer found some pieces of wood, resembling that used by the defendant, in the stone yard, the morning after the homicide was committed; but these were some distance away from where the deceased was found, and none of them bore any evidence of having been used in a combat. Unlike the defendant's club, no piece of wood so found had blood thereon. The defendant testified that the deceased struck him "five or six times" in the face with his fist, but his face bore no evidence of such pummeling, nor did he ever complain of that until the day of the trial. One witness testified that when the defendant returned to Francesconi's saloon, he held out his hands and said something about somebody "trimming" him, and the witness noticed some slight scratches on his hands. The police officers, however, who closely examined the defendant's person, did not notice any scratches, the only disfigurement which they saw being a bruised or discolored ear. But the defendant did not state in his testimony that this was caused by the deceased, his testimony in this regard being, "He struck me around the ear some place—which I couldn't say—I don't say which side of the head—I don't know which side of the head I was struck on." All the physical facts tend to prove that the defendant was the aggressor; that he began, entered into, and brought the hatched-up controversy to its fatal finish. Hence, the court did not err in submitting that phase of the case to the jury by the instruction in question. Indeed, the instruction on self-defense is based wholly on the defendant's own testimony, and this the most flimsy and shadowy kind, and the giving of the instruction was a concession to the defendant.

221 Sup—35

In fact, the testimony of the defendant is very rambling, disconnected and confusing, and is evidently that of a man who was greatly embarrassed and confused while on the witness stand. Nor is it within the bounds of probability that the defendant could have had so many experiences, including his walk of two blocks with the deceased towards the Morische saloon; his drinking at said saloon; his meeting, walking and talking with his friend, Mr. Crump; his walking back in the direction of the Francesconi saloon; his meeting with and combat with the deceased in the alley—all within the short period of half an hour. Francesconi testified that the defendant returned to his saloon about half an hour after the defendant and deceased left there. Again, the defendant testified that when he and the deceased parted at the gateway leading to Morische's garden, the deceased said, ''I am going to my bunk and go to sleep,'' and he (defendant) said, ''I am going in to have another drink [meaning at Morische's saloon], and then I am going to Mike's and from there home.'' According to this testimony they parted in the most amicable terms, and there was nothing said or done showing that the deceased bore the defendant any ill-will. Nevertheless, according to the defendant's theory, the deceased must have suddenly formed the design to do him physical injury, and in order to execute such design, the deceased, instead of going to his ''bunk,'' retraced his steps, stopped at the corner of the alley near the Francesconi saloon, and there waited for the defendant. This, to say the least, is very improbable. It is quite plain that the homicide was committed just after the defendant and deceased left the Francesconi saloon. They left there about 5:20 o'clock that evening, and Ida Bunting testified that it was about 5:30 o'clock when she saw the assault.

The killing was cruel and wanton, and without a single palliating circumstance. Finding no reversible error in the record, the judgment is affirmed. All concur.