THE STATE v. VIRGIL PAINTER, Appellant.—44 S. W. (2d) 79.

Division Two, December 1, 1931.

*G. W. Thornberry*, *G. Purd Hays* and *D. F. McConkey* for appellant.

*Stratton Shartel*, Attorney-General, and *Albert Miller*, Assistant Attorney-General, for respondent.

318

COOLEY, C.—Defendant Virgil Painter was charged by information filed in the Circuit Court of Stone County with the crime of murder in the first degree in that he did, at said county, on September 30, 1929, with a knife, a dangerous and deadly weapon, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, kill and murder one W. H. Beard. Upon the defendant's application a change of venue was awarded to the Circuit Court of Taney County, where the case was tried and on June 11, 1930, the defendant was found guilty of murder in the first degree as charged and his punishment was assessed by the jury at life imprisonment in the penitentiary. From sentence and judgment in accordance with the verdict the defendant has appealed.

The defendant and Beard, the deceased, were neighboring farmers residing in the vicinity of Galena, Stone County. Defendant was about fifty-three years old, Beard several years older. There had been some ill-feeling between them for a year or so prior to the homicide, though they met without manifesting rancor toward each other. There are hints in the evidence that Beard may have entertained a belief or suspicion that Painter was paying undue attention to his (Beard's) wife and resented it. The two met on September 30, 1929, on the sidewalk in front of Craig's store at Galena, where both had done some buying. It is not clear which first spoke to the other. Defendant testified that Beard spoke to him first. The State's evidence tends to prove the following:

When the two men were near the southwest corner of the store building, one (which one the witnesses did not know) was heard to say something about "the woman," not mentioning any name. Defendant said: "Come on, go on up the walk with me and I will settle it with you." They then walked northward on the sidewalk on the west side of the store toward an alley in the rear, a hundred feet or more from said corner. They walked side by side or with Beard slightly in advance. Beard carried over his right shoulder a sack in which were some groceries, and defendant carried under one arm a small package of merchandise. Some distance before they reached the alley defendant drew from his pocket and opened his pocket knife, carrying it thereafter in such way that it could not be seen by Beard. About that time, according to one witness, one of the men called the other a "damn liar," but witness could not say which one used the epithet. There was testimony that during

their progress toward the alley they were talking, but only a few words of their conversation were distinguished, the witnesses being some distance away. One witness heard defendant say to Beard: "She is a damn good woman, but she has got a hell of a man." She did not know of whom defendant was speaking. According to another witness, when the men reached or were crossing the alley, Beard said: "Well, I tend to my own God-damn business and don't meddle with nobody's affairs. The woman says . . ." The narrative there breaks and the balance of Beard's statement is not shown. About that time defendant threw aside the package he had been carrying, and with his left hand caught Beard somewhere about the right shoulder, and began stabbing and cutting him with the knife which he had in his right hand. He struck a number of blows in quick succession, inflicting at least four wounds. When defendant seized and began striking him Beard transferred to his left shoulder the sack, which until then he had carried slung over his right shoulder and held with his right hand, and struck back, trying to beat defendant off. None of the witnesses saw any weapon or implement in Beard's hands. All of the eye witnesses testified that defendant struck first, and that Beard before being struck had made no threatening demonstration toward defendant.

The encounter lasted a very brief time until the participants backed away from each other. Beard discovered that he was bleeding and said to defendant: "Did you knife me?" To which defendant replied: "Yes, I knifed you." Defendant closed and pocketed his knife, went to an officer and surrendered himself. Beard was hurried to a doctor, by whom he was examined. The examination revealed four knife wounds, two in his left arm, a straight stab wound "in the side or a little in the back" just below the heart, and a wound "across the lower part of the belly." The latter laid open the abdominal cavity, permitting the intestines to protrude. It was about four inches long on the "skin surface," and about five inches long on the inside or "peritoneum surface." The doctor probed the stab wound with his finger, but could not reach the bottom of it. Either of the body wounds, in the opinion of the doctor, might have caused death. The doctor thought when he examined the wounds that they would prove fatal. Beard died four or five days later from general peritonitis induced by the wounds.

The defendant relied upon self-defense. He testified that Beard accosted him in front of Craig's store, saying: "Come out here, I want to see you;" that Beard asked him why he had gone to Springfield and "talked about him," and when he denied having done so Beard called him a "God-damn liar," whereupon he said to Beard: "Let's don't quarrel here," and they moved northward toward the alley, Beard still accusing him of having talked about him and call-

ing defendant a God-damn son-of-a-bitch; that he observed a rock in Beard's hand, partially concealed under the sack the latter carried over his shoulder; that just before he struck Beard the latter repeated the above mentioned accusation and epithet and added: ''I aim to kill you;'' and that as he made that threat Beard shifted his sack to his left shoulder and ''drawed back,'' whereupon he, defendant, caught Beard with his left hand, and Beard struck him over the eye with the rock and dazed him so he could hardly see; and that he thereupon struck Beard several times as fast as he could with the knife; that he did so because Beard had said he would kill him and he was afraid of Beard; that he made no effort to retreat or withdraw from the fight. Defendant introduced evidence tending to prove that Beard had previously threatened to kill defendant and such- threats had been communicated to defendant.

The foregoing outline of the evidence is sufficient for a general understanding of the case. It is not contended on this appeal that the evidence was insufficient to sustain the verdict. The court submitted the case to the jury upon instructions covering murder in the first and second degrees, manslaughter and self-defense, including appropriate instructions relative to threats made by deceased, and also gave the customary instructions on presumption of innocence and reasonable doubt.

I. Defendant in his motion for new trial charges error because of certain remarks of the prosecuting attorney in his opening statement to the jury and in his argument. In his opening statement the prosecuting attorney started to speak of a dying statement thus: ''I will say that the dying statement . . .'' when he was interrupted by an objection from defendant's counsel. The court sustained the objection and directed the prosecutor to omit reference to the dying statement. Later in his statement the prosecutor said: ''Would I be allowed to say that the dying statement shows that . . .'' The court interposed and directed him to ''leave the dying statement out,'' and it was not further referred to.

A statement had been made by Beard after the doctor had told him that in the latter's opinion he could not recover, which statement was offered at the trial. It was excluded because the court thought, after hearing evidence relative thereto not in the presence of the jury, that it did not sufficiently appear that Beard had given up hope of recovery. But there is nothing to indicate that the prosecutor was not acting in good faith when he referred to it in his opening statement. [State v. Matkins (Mo.), 326 Mo. 1072, 34 S. W. (2d) 1, 6.] The reference could not have been prejudicial because nothing was said about what the dying statement would show.

Moreover, defendant requested no further action of the court and saved no exceptions and is therefor in no position now to charge 'the trial court with error. [State v. Wana, 245 Mo. 558, 150 S. W. 1065; State v. Kelley (Mo.), 284 S. W. 801, 803 and cases cited; State v. Court, 225 Mo. 609, 616, 125 S. W. 451.]

In argument to the jury the prosecuting attorney referred to the fact that the defendant had taken a change of venue ''from his own neighborhood where people knew him and knew Beard.'' Defendant objected and the court sustained the objection and told the jury that the defendant had a right to take a change of venue, that it was no evidence of guilt or innocence for him to do so and that the jury should not consider that circumstance in passing upon the question of his guilt or innocence. Again defendant failed to request further action of the court and saved no exceptions, apparently being satisfied with what the court had done. He cannot now, therefore, successfully urge that prejudicial error was committed against him in that occurrence. [See authorities supra, this paragraph.]

Other alleged improper remarks of the prosecuting attorney complained of in appellant's brief were not even objected to at the time and are not assigned as error in the motion for new trial, hence are not here for review.

II. Over the objections of the defendant the court permitted the State to prove that while confined in jail after Beard had died the defendant drank some carbolic acid and was sick from it several days, requiring medical treatment; the inference being that he took the acid with suicidal intent. The admission of that evidence is assigned as error. Only three cases dealing with this precise question have been called to our attention and we have found no others.

In People v. Duncan, 261 Ill. 339, 103 N. E. 1043, the Supreme Court of Illinois, in holding such evidence admissible, said:

''The admission of the proof of the attempt of plaintiff in error to take his life while confined in the county jail is assigned for error. It has been universally held that the escape from custody or flight of one accused of crime may be proven upon the trial as a fact raising a presumption of guilt. It is insisted that an attempt at suicide is not analogous to flight or escape from custody, for the reason that in fleeing the accused is attempting to escape punishment entirely, whereas in attempting suicide he is endeavoring to inflict upon himself the highest punishment known to the law; and it is also pointed out as a matter of common knowledge that many people commit suicide who are charged with no offense and who do so for various and sometimes trivial reasons. While it may be true that one entirely innocent of the charge might under like circumstances attempt to

flee, escape from custody, or take his life, it is not the action that would be expected of an innocent man, and such acts could in no sense be interpreted as indicating innocence. On the other hand, it is undoubtedly true that one guilty of the charge might prefer to avoid the humiliation and disgrace of a conviction and escape the punishment imposed by law by taking his life, just as he might seek to accomplish the same result by flight or escape from custody. The fact that defendant attempted to commit suicide was a circumstance which was proper to be taken into consideration by the jury in connection with all the other facts and circumstances proven.''

In State v. Jaggers, 71 N. J. L. 281, 58 Atl. 1014, 108 Am. St. 746, such evidence was held ''plainly admissible'' upon the same principle that justifies admission of evidence of flight or escape from custody under a criminal charge.

The question is dealt with in State v. Coudette, 7 N. D. 109, 72 N. W. 913, but from a different standpoint. While the reasoning of the court seems to indicate a different view as to the competency of the evidence from that entertained by the Illinois and New Jersey courts in the cases above cited, the question involved and decided was not the competency of the evidence as a circumstance for the consideration of the jury along with other circumstances, but its suffficiency under the North Dakota statute to constitute corroboration of the testimony of an accomplice. The statute prohibited conviction upon the testimony of an accomplice ''unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense.'' The only evidence against the defendant was the testimony of an alleged accomplice, uncorroborated unless the defendant's attempt to commit suicide was sufficient corroboration to satisfy the statute. The court, after an interesting discussion of the reasons that may induce an attempt to commit suicide and reference to particular circumstances that probably in part at least induced the attempt in that case, announced its conclusion that: ''In view of these undisputed facts and the circumstances, it would shock the sense of justice to say that this attempt at suicide, standing alone, raises a presumption of guilt which so far corroborates the testimony of an accomplice that a conviction could be based upon his testimony.'' The court was not called upon to and did not decide whether or not, had there been otherwise a submissible case made, the attempt to commit suicide might have been proved as a circumstance for the consideration of the jury.

In the case at bar it is quite true that the appellant's attempt to take his own life may not have been induced by a consciousness of guilt or the fear of conviction; yet, as said in People v. Duncan, supra, it is hardly the action that would be expected of an innocent man. We would not say that it raises a presumption of guilt; but

we agree with the Illinois court that it was a circumstance which might properly be proved and taken into consideration by the jury in connection with all the other facts and circumstances proven. We accordingly rule this point against the appellant.

III. Error is assigned in instruction numbered 10, given by the court, as follows:

"The right to defend one's self from danger, not of his own seeking, is a right which the law not only concedes but guarantees to all men. The defendant may, therefore, have killed William Beard and still be innocent, of any offense against the law. If, at the time he cut and killed William Beard he had reasonable cause to apprehend on the part of the deceased, William Beard, a design to do him some great personal injury, and there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to avert such apprehended design he cut and stabbed William Beard, and at the time he did so, he had reasonable cause to believe, and did believe it necessary for him to use the knife in the way he did, to protect himself from such apprehended danger, then, and in that case, the cutting and killing was not felonious, but was justifiable, and you ought to acquit Virgil Painter, the defendant, upon the ground of necessary self-defense.

"It is not necessary to this defense that the danger should have been impending and immediately about to fall. All that is necessary is that defendant had reasonable cause to believe and did believe these facts. But before you acquit on the ground of self-defense, you ought to believe that defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the cause, you cannot acquit in such case, on the ground of self-defense."

The only complaint made of the instruction is that because of the phrase "not of his own seeking," following the word "danger" in the first sentence, the instruction "deprived the defendant of any right of self-defense if he sought the difficulty."

If defendant sought and entered into the difficulty for the purpose of inflicting upon the deceased death or great bodily harm he thereby lost the right to invoke self-defense. If he sought or voluntarily entered into the difficulty without such felonious intent he would still have what has sometimes been termed the right of imperfect self-defense, not a complete exoneration but which would reduce the grade of homicide to manslaughter. See State v. Gilmore, 95 Mo. 554, 8 S. W. 359 and 912; State v. Partlow, 90 Mo. 608, 4

S. W. 14; State v. Roberts, 280 Mo. 669, 681, 217 S. W. 988. But instructions must be predicated upon the evidence and we think there was no evidence in the case calling· for an instruction on imperfect self-defense or presenting that issue. Defendant's counsel suggest in their argument that he may have intended only a fist fight or common assault. Fist fights are not conducted with knives. The State's evidence presents no self-defense issue. Defendant's evidence may entitle him to an instruction on perfect or complete self-defense, and on that issue the instruction given is not objectionable. But we do not think defendant's evidence presented an issue of imperfect self-defense, and for that reason the instruction would not be erroneous in this case if it did deny defendant that defense.

However, we are further of the opinion that defendant misconstrues the effect of the instruction. The first sentence: ''The right to defend one's self from danger not of his own seeking is a right which the law not only concedes but guarantees to all men,'' is an abstract statement of law. If it be conceded that from the phrase ''not of his own seeking,'' standing alone, the implication might be drawn that if the defendant sought the danger he could not justify on the ground of self-defense, yet considering the instruction as a whole we are confident the jurors could not have understood that they should not accord defendant the benefit of his claim of self-defense if they thought he had sought the difficulty. Following the general language with which the instruction begins, it proceeds to state and explain the facts which, if found by the jury, justify the defendant on the ground of self-defense and there is attached *no condition* that the danger apprehended by defendant must have been unsought by him. The jurors are told unconditionally and without reference to whether or not defendant had sought the difficulty or invited the danger, that if, *at the time* he cut Beard he had reasonable cause to and did apprehend great personal injury from Beard, his act was justifiable and he should be acquitted on the ground of self-defense. In this respect the instruction differs from one given on the same subject which we criticised in State v. Malone, 327 Mo. 1217, 39 S. W. (2d) 786, 793. We think defendant has no just ground of complaint of this instruction.

IV. Error is assigned in that the instructions assumed, without requiring the jury to find, that the knife with which deceased was killed was a deadly weapon. The knife was in evidence and was seen by the court. The character of the wounds produced by it and their effect were shown and not disputed. We may appropriately quote from State v. Belfiglio, 232 Mo. 235, 134 S. W. 508, where it was contended that the court should have submitted to the jury the question of whether or not the screw-

driver with which the fatal wound was inflicted in that case was a deadly weapon, as follows:

"However, in a case like the one at bar where the weapon used was of such a nature that defendant was able to drive it through the skull of an adult with one hand, at a single blow, and where the weapon was introduced at the trial, but no description of it is preserved in the evidence whereby this court may know its size, length, weight or whether sharp or blunt at the point, we will assume that the learned trial judge did not err in telling the jury as a matter of law that it was a deadly weapon." [232 Mo. l. c. 239.]

In this case the evidence showed that the blade of the knife was very sharp and long enough to produce a stab wound so deep that the doctor could not reach the bottom of it with his finger. Another of the wounds laid open deceased's abdomen so as to permit the intestines to protrude. Either of those two wounds might have caused death and they did cause death. Those wounds demonstrate the deadly character of the weapon used. As was well said in State v. Bowles, 146 Mo. 6, 13, 47 S. W. 892:

"A deadly weapon is any weapon or instrument by which death would likely be produced, when used in the manner in which it was used in the affray. It needs no argument to prove that a knife capable of inflicting a wound of the dimensions and depth shown in this record, and in a vital part of a grown man, was such a weapon as the law denominates deadly or dangerous."

In State v. Dunn, 221 Mo. 530, 120 S. W. 1179, the lethal weapon was a club described in the indictment and in the evidence as a heavy piece of wood, twenty-two inches long, three and a half inches wide and one and three-fourths inches thick. The instructions assumed, as in this case, that it was a deadly weapon. In holding that the trial court did not err in assuming that the club in question was a deadly weapon, this court said:

"No one of ordinary intelligence would hesitate for a moment in concluding that the club in question, in the manner in which it was used upon the deceased, was a dangerous and deadly weapon. As was said in Hamilton v. People, 113 Ill. l. c. 38, 'such things as all persons of ordinary intelligence are presumed to know are not required to be proven.'" [221 Mo. l. c. 541, citing cases.]

A like ruling was made in State v. Fletcher (Mo. Sup.), 190 S. W. 317, 321, in which case the murder was committed with a club and an instruction assuming the club to be a deadly weapon was held not to be erroneous.

We hold that the instructions in this case were not erroneous in assuming that the knife used was a deadly weapon.

V. There are other allegations of error in the motion for new trial which have not been briefed or assigned as error in this court and have apparently been abandoned. We have examined them and we find them to be without substantial merit. The information, verdict and judgment are in due form. Appellant was represented by able counsel and was given a fair trial. The evidence was sufficient to sustain the verdict.

There being no reversible error in the record the judgment of the circuit court must be and it is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.