## STATE OF·NORTH DAKOTA *vs.* ALEC COUDOTTE.

Opinion filed Nov. 8th, 1807.

**Testimony of Accomplice—Corroboration.**

> The testimony in this case relied upon by the state as furnishing the corroboration required to warrant a conviction upon the testimony of an accomplice examined, and *held* to furnish no corroboration, under section 8195, Rev. Codes, which declares that "a conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

**Corroboration Must be Independent of Accomplice.**

> Testimony that tends to connect the defendant with the commission of the offense charged only when supplemented by certain testimony of the accomplice is not such corroborating testimony as the statute requires.

**Attempt at Suicide—Not Evidence of Guilt.**

> There is no presumption of guilt arising from the fact that a person charged with crime, and while in confinement, and before trial, attempts to commit suicide,

Appeal from District Court, Emmons County; *Winchester*, J.
Alec Coudotte was convicted of murder and appeals.
Reversed.

*R. N. Stevens* and *John Stowell*, for appellant.
*John F. Cowen*, Attorney-General, *H. A. Armstrong*, State's Attorney of Emmons County, and *E. S. Allen*, for the State.

BARTHOLOMEW, J.   The appellant, Alec Coudotte, was informed against by the state's attorney of Emmons County for the crime

of murder in the first degree, in killing one Thomas Spicer, in said county, on the 17th day of February, 1897. He was tried, convicted, and sentenced to be hung, in the District Court of said county. A motion for a new trial, made on a statement of the case, was denied, and the appellant brings the entire record to this court by appeal. The errors alleged, and which we shall discuss, relate exclusively to the sufficiency of the evidence to support the conviction. If there was in the case no question as to the proper corroboration of an accomplice, our task, in this instance, would be brief. True, there is strong evidence in the case tending to support the appellant's claim of alibi; but, on the state of this record, no court would be warranted in disturbing the finding of the jury upon that point. But the principal evidence for the state in this case came from two confessed accomplices. Our statute, voicing the almost universal practice in both Enggland and the United States even in the absence of statute, declares, in section 8195, Rev. Codes: " A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof." The specific requirement, under this section, is that the corroborating evidence tends to connect the defendant with the commission of the offense. Whart. Cr. Ev. § 442, declares: " The corroboration requisite to validate the testimony of an alleged accomplice should be the person of the accused. Any other corroboration would be delusive, since if corroboration in matters not connecting the accused with the offense were enough, a party who, in the case against him, would have no hope of escape, could, by his mere oath, transfer to another the conviction hanging over himself." And Rosc. Cr. Ev. 130, states the principle thus: "There may be many witnessess, therefore, who give testimony which agrees with that of the accomplice, but which, if it does not serve to identify the accused parties, is no corroboration of the accomplice." Under this principle, which

courts were compelled originally to adopt to protect innocent persons, and which, by innumerable decisions, was crystalized into universal law, and which is declared in clear and specific language by our statutes, it will not be necessary or proper for us to discuss any of that portion of the so-called corroborating testimony which simply goes to show that the crime was committed, and the time and manner of its commission. We can profitably discuss only such portions of this testimony as it may be claimed in some degree tend to identify this defendant with the commission of the crime.

The confessed accomplices are Philip Ireland and Paul Holy Track. These parties also accuse the defendant and one George Defender with being present, and aiding and participating in the commission of the crime. All these parties are Indians, or persons of Indian descent. They belong at the Standing Rock Indian agency. This agency is situated on the west bank of the Missouri River, and opposite the town of Winona, in Emmons County. The residence of Thomas Spicer, where the crime was committed, was about 1¾ miles north of Winona, and on the same side of the river, which at that season of the year (February 17th) was frozen over solidly, and could be crossed at any point. The crime that was committed has few parallels in atrocity and wanton cruelty. The sole object for its commission was to plunder the house. To accomplish this purpose, Thomas Spicer and his wife, and his wife's aged mother, Mrs. Waldron, and their married daughter, Mrs. Rouse, were foully murdered; and then, actuated, it would appear, solely by the instincts of a savage, the perpetrators proceeded to murder the twin baby boys of Mrs. Rouse. Six persons in all were killed. It could not be otherwise than that a deed of such depravity should arouse the community where committed almost to frenzy. Every instinct of humanity and of justice demanded the swift and certain punishment of the inhuman miscreants whose minds could conceive and whose hands could execute a deed so dastardly. Standing face to face with such a crime the judgment of a juror, however intelligent

and honorable he may be, must inevitably be influenced in some degree by his surroundings. It is to the credit of his nature that it cries out for punishment for such a crime. But under such circumstances it is too plain for argument that the court, if such a thing could be possible, should exercise all the greater care to see to it that the evidence does conform to a well-established and statutory rule, which the experience of ages has shown to be necessary for the protection of innocent persons. It was suggested in argument that as there were two accomplices, and their testimony was substantially the same, a less amount of corroborating evidence than in ordinary cases, and where there was but one accomplice, would suffice. This argument should be addressed to the jury. It can have no weight here, because we are not concerned with the amount of corroborating testimony. If there be any such evidence, coming within the requirements of the statute, its weight was for the jury, and we cannot disturb their verdict. But, if there was no such testimony, then the jury should have been so instructed, or, failing in that, the motion for a new trial based upon that ground should have been granted.

We shall discuss the testimony only so far as may be necessary to an understanding of those portions which the state claims furnish the corroboration required by the statute. It appears that after Coudotte's arrest, and prior to his preliminary hearing, he was confined in jail at Williamsport, the county seat of Emmons County. While thus confined he was visited by several parties who spoke the Sioux language, which was Coudotte's native tongue—and he could speak no other—and they endeavored to procure from him a confession. Prior to this time he had gashed himself in the abdomen with a knife. The state claims, and perhaps correctly, that this was an attempt to commit suicide. He was suffering from the wound at the time of the interview, and stated to the witnesses that he expected to die from its effects. In that interview, if we accept as true what the witnesses state, Coudotte said that he was in Winona on said February 17, 1897; that he left there about two o'clock in the afternoon, and crossed

over to the agency, where he met one Frank Blackhawk; that Blackhawk was intoxicated, and took another drink of whisky from a supply that he (Coudotte) had; that Blackhawk then said to Coudotte that he was going over to kill the Spicer family, and asked Coudotte to go with him, which Coudotte refused to do, but immediately proceeded to his home. He gave as his reason for going home—to quote one of the witnesses: "Because people were going to be killed, and he would be home, so there would not be any blame for him." He also stated, according to the witnesses, that on February 20th he again met Blackhawk at one of the agency stores, and Blackhawk told him that he had killed the Spicer family, and wanted to give him money to keep the secret. We notice that the testimony of the accomplices in no manner implicates Blackhawk in the crime. But we assume that he was implicated. The utmost that can be claimed for this statement is that Coudotte was told beforehand that the Spicers were to be killed, and was told afterwards that they had been killed. But how can knowledge alone tend to connect him with the commission of the offense? Clearly, in no manner, and to no extent. The proposition is self-evident. It is proper to add that, through this statement wherein this knowledge is admitted, the appellant emphatically denies any connection with the commission of the crime.

The learned state's attorney claims much in the way of corroboration from the testimony of one Welch, who testifies that he thinks he saw the defendant and George Defender together on horseback at the Ft. Yates mule corral at or a little after six o'clock in the evening of the day on which the murder was committed. This would, at best, be very dangerous testimony on which to base a conviction for murder. The witness was 200 yards—nearly one-eighth of a mile—distant from the parties. We know that at or soon after 6 o'clock in the evening of February 17th, in this latitude, it is nearly or quite dark. Positive identification at that distance would be impossible, and in fact the

N. D. R.—8.

witness does not pretend to be positive.    But assume that his sur-
mise was correct; in what manner does the presence of Coudotte
and Defender together at the corral, three miles southwest from
the Spicer place, at 6 o'clock in the evening, tend to connect
them with the commission of the offense?    We doubt not, many
other men might have been found together at that hour at points
much nearer the Spicer place.    Had the accomplices accused
such other parties, their presence together would have been no
evidence whatever tending to connect them with the commission
of the offense.    A contrary contention reaches absurdity, and yet
the fact, standing alone, would be just as much evidence in one
case as in the other.    But the state's attorney argues that the
accomplices testified that, after the murder had been committed,
Coudotte and Defender left the Spicer place, on horseback, going
north; that this evidence establishes the parties together on
horseback at the scene of the murder; and that, taken with the
further fact that they were seen together on horseback, two or
three hours later, by another party, tends to connect them with
the commission of the crime.    We do not concede that the con-
clusion follows the premises, but in any event, in order that this
testimony should show any force whatever as corroborating tes-
timony, it is necessary to include the portion given by the accom-
plices.    In other words, the accomplices must be permitted to
corroborate themselves.    This is utterly untenable.    What we
have just said applies with still greater force to the claim made
for the testimony tending to show these same parties together at
Winona on the night of February 18th.    There is much conflict
in the testimony as to whether or not they were there.    In our
judgment it is immaterial.    The fact alone of their presence at
Winona 30 hours later would in no manner tend to connect this
defendant with the commission of the crime.    Nor would such
fact, if it were a fact, be any more incriminating because the de-
fendant, on oath, denied it.

The state also claims some corroboration in the evidence relat-
ing to some beef which it is admitted was sold by Coudotte in

Winona about 4 o'clock on Tuesday, February 16th. We have read and re-read this testimony. We find no element of corroboration of the nature required by statute in it. Paul Holy Track testified that himself, the defendant, and Blackhawk killed a steer about daylight in the morning of February 16th in the timber near the Spicer house, and that the beef sold by Coudotte was a part of this animal. Coudotte claims that it was a portion of an animal killed by himself and Blackhawk at an entirely different place, and more than 24 hours earlier. But let us concede that the steer was killed as Holy Track testifies, and that Coudotte sold a portion of it in Winona on Tuesday afternoon; how does that tend to connect Coudotte with a crime committed 24 hours later? What possible connection could exist between the sale of this beef and the murder of Thomas Spicer? If there be any, it is found in the testimony of Paul Holy Track, and there only.

Persons who examined the body of Thomas Spicer testified that four different weapons had been used, either in committing the murder or mutilating the body, to-wit, a gun loaded with a leaden bullet and shot, an ax, a pitchfork, and a spade or shovel. The state claims that this raises a presumption that four persons participated in the crime. This is surmise, merely. The dastard who fired the gun would not hesitate to dispatch a wounded victim with an ax. There is no presumption that a murderer will use but one weapon. But if, from the fact that four weapons were used, a jury would be warranted in saying that four persons participated in the crime, where is the corroborating testimony that declares, or tends to declare, who these four persons were? The use of the weapons points as directly towards any other Indian on the reservation, or any citizen of Winona, as towards this defendant. This evidence is a striking instance of the precise vice against which the rule as to corroborating an accomplice is directed. It fails to tend to identify the party.

There remains but one further fact from which the state claims any corroboration whatever—the only fact that has given us any trouble—and that is the attempted suicide. Upon this question

we get no direct aid from the authorities.   The question whether
or not any presumption of guilt arises from an attempt to commit
suicide, made before trial, is one that has never been discussed,
or even adverted to, so far as we can ascertain.   Counsel seek to
assimilate an attempt to commit suicide with flight, and, since the
fact of flight is generally allowed to go to the jury as some evidence
of guilt, it is urged that, where a party charged with crime attempts
to commit suicide, that fact raises a presumption, more or less
strong, that such party is guilty of the crime charged.   The argu-
ment is specious, but we think the parallel deceptive and danger-
ous.   One who flees does so, generally, for the purpose of avoid-
ing the punishment that follows violated law.   One who commits
or attempts suicide seeks to avoid no punishment.   He deliber-
ately accepts the highest punishment that the law could possibly
inflict—death.   Hence the very circumstance that raises the pre-
sumption of guilt from flight is absolutely wanting in suicide.   In
this, some impelling motive other than a desire to evade the pun-
ishment by law must be the basis for the act, and we think this
motive will usually be found along the line of those facts and cir-
cumstances which make flight itself innocent.   Whart. Cr. Ev., in
speaking of flight, concealment, etc., says (section 750) :   " But
it must be remembered that, while these acts are indications of
fear, they may spring from causes very different from that of con-
scious guilt."   And the author quotes from Best, Ev. (5th Ed.)
578 :   " Many men are naturally of weak nerve, and under certain
circumstances the most innocent person may deem a trial too
great a risk to encounter.   He may be aware that a number of
suspicious, though inconclusive, facts, will be adduced in evidence
against him.   He may feel his inability to procure legal advice to
conduct his defense, or to bring witnesses from a distance to es-
tablish it.   He may be assured that powerful or wealthy individ-
uals have resolved on his ruin, or that witnesses have been
suborned to bear false testimony against him."   He who commits
or attempts suicide, since he does not seek to avoid punishment,
must seek to avoid the disgrace that attaches to being charged

with crime—the ignominy that attaches to a public trial for crime. He is deficient in the nerve necessary to face the situation, or it may be that a wild, untamed nature rebels beyond all bounds at being confined. But with what natures would these motives of delicacy be most powerful—the innocent or the guilty? That person whose nature was so depraved and hardened that he could commit the crime charged in this information would feel no sensitive shrinking from the disgrace of an arrest or trial. It is a well known fact that the suicidal tendency frequently manifests itself in insane persons. It has been said that no perfectly sane person ever committed suicide, and there is doubtless an element of truth in the statement; and, the greater the dementia, the more probable the desire of self-destruction. When we essay the task of accounting for suicide on any general grounds, we undertake a task that, from its very nature, is impossible of performance. The human mind is so wonderfully, yet so delicately, constructed, the human passions are so powerful, yet so varied, that it is idle for any one person to pretend to enter the consciousness of another, and account for the inner workings of that other mind. We only know that, whatever may be the motive, it is not, and cannot be, a desire to avoid punishment. The number of innocent persons who commit suicide within any given time is always many times greater than the number of guilty persons who commit suicide within the same time. Hence suicide can always be accounted for upon the hypothesis of innocence more readily than upon the hypothesis of guilt. This being true, a jury never could be permitted to treat it as an evidence of guilt. We believe that it would be dangerous to innocence to declare, as a legal proposition, that an attempt to commit suicide before trial raises a presumption of guilt in any case. The danger of such a proposition is well illustrated by this case. This defendant, an Indian, finds himself torn from his tribal surroundings, and incarcerated in a prison of those whom he regards as his hereditary enemies. He is charged with the murder of a white man. He believes himself to be absolutely in the hands of

those who hate his race. He is ignorant of our laws and our court proceedings. He knows only too well what would be the result were the conditions reversed, and he cannot understand why he should receive treatment different ·from that which he would mete out to an enemy. Seeing only the blackness of darkness ahead of him, and that irrespective of his innocence or guilt, would it be strange that his nerve should fail him, and he seek to shut out the hated picture by severing his hold upon life? Moreover, he comes of a race whose untamed natures cannot brook confinement. The defendant was asked on cross-examination why he attempted to commit suicide, and promptly answered that he did it because he did not like to be confined. And a witness in the case, who has spent practically his entire life with the Sioux Indians, speaks their language, and understands every phase of their character, and whose testimony is entirely uncontradicted, says: "I have often known, if an Indian is put in the guard house for any little offense, I have known them to cut themselves, and try to commit suicide in many different ways. That seems to be a predisposition among them, in confinement. I have frequently known of Indians attempting suicide because they were in confinement. I was present at a conversation with Coudotte in the Emmons County jail. He spoke in my presence in relation to his attempt to commit suicide. He said he could not stand to be confined, and he would just as soon be dead as to have to stay in there and stand the confinement." In view of these undisputed facts and the surrounding circumstances, it would shock the sense of justice to say that this attempt at suicide, standing alone, raises a presumption of guilt which so far corroborates the testimony of an accomplice that a conviction could be based upon his testimony.

We have discussed every point in the evidence from which the state claims any corroboration whatever, and we find that in each instance the testimony fails to meet the statutory requirement. It follows that the motion for a new trial should have been granted, and that the judgment based upon the verdict must be

set aside, and a new trial ordered. It is proper to add that owing to the enormity of the crime in this instance, and the deep indignation of the public, and the positive statements of the confessed murderers, Paul Holy Track and Philip Ireland, the learned state's attorney of Emmons County could not, in the performance of his official duty, do less than present to the court this information against Coudotte. He has certainly pursued with diligence and intelligence every source of information open to him that promised any corroborating testimony, and he presented the testimony that he could procure to this court in the strongest light that it will bear. But, tested by an inflexible rule of law, that testimony cannot support a conviction.

Reversed. All concur.