## STATE v. PHINEAS DODSON.

(136 N. W. 789.)

**Criminal law — accomplice — corroboration — testimony.**

1. Under § 10,004, Rev. Codes 1905, which provides that "a conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof," it is not necessary that the corroborative evidence shall cover every material point testified to by the accomplice, or be sufficient in itself to warrant the verdict of guilty. If the accomplice is by such testimony corroborated as to some material fact or facts tending to connect the defendant with the commission of the offense, the jury may from that infer that he speaks the truth as to all.

**Criminal law — indictment and information — trial — argument of counsel.**

2. Under the facts of this case and under § 10,000 of the Revised Codes of 1905, which provides that "in the trial of a criminal action or proceeding before any court or magistrate of this state, whether prosecuted by information, indictment, complaint, or otherwise, the defendant shall at his own request, and not otherwise, be deemed a competent witness, but his neglect or refusal to testify shall not create or raise any presumption of guilt against him, nor shall such neglect or refusal be referred to by any attorney prosecuting the case, or considered by the court or jury before whom the trial takes place," it was not error for the prosecuting attorney in his closing argument to ask the question, "Why hasn't he [the defendant] witnesses here to prove where he was on the night of March 9, 1911?" Nor was this made prejudicial error by his subsequent explanation after an objection made by defendant's counsel that "I am not talking about the defendant, but I am asking why he did not put other witnesses on to show where the defendant was on this night."

23 N. D.—20.

**Criminal law — trial — argument of counsel.**

3. Nor, after such remarks, was it error for the trial court to charge the jury that no prejudice or presumption of guilt should be indulged in by the jury against the defendant on account of his failure to take the stand.

**Criminal law — trial — argument of counsel — trial court — prejudice.**

4. Section 10,000, Rev. Codes 1905, does not prevent the court from calling attention to its provisions and to the privilege of the defendant of refusing to testify without prejudice to himself, if, in the court's opinion and discretion, it seems that the jury may be misled in regard to the matter, provided that he makes it clear that nothing prejudicial to the defendant may be assumed from his failure to appear and testify, the purpose of the rule being to prevent the state's attorney from calling attention to the matter and commenting unfavorably thereon. Especially is this the case where an unnecessary objection on the part of defendant's counsel has brought the matter to the attention of the jury.

Opinion filed May 17, 1912.

Appeal from the District Court of La Moure county; *Coffey, J.*

Defendant was convicted of the crime of grand larceny, and appeals. Affirmed.

*Curtis & Curtis* and *Davis & Warren,* for appellant.

Conviction cannot be had upon the testimony of an accomplice, unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof. State v. Coudotte, 7 N. D. 109, 72 N. E. 913; State v. Kent, 4 N. D. 577, 27 L.R.A. 686, 62 N. W. 631; State v. Hicks, 6 S. D. 325, 60 N. W. 66; State v. Phelps, 5 S. D. 480, 59 N. W. 471; State v. Levers, 12 S. D. 265, 81 N. W. 294; 12 Cyc. 453–459.

Remarks of the state's attorney as to defendant's not testifying, and the instruction of the court upon the fact that defendant did not testify, were prejudicial error. State v. Williams, 11 S. D. 64, 75 N. W. 815; State v. Garrington, 11 S. D. 178, 76 N. W. 326; State v. Bennett, 21 S. D. 396, 113 N. W. 78; 12 Cyc. 576.

*George P. Jones,* for respondent.

Evidence is sufficient without the testimony of Carter, to make a good case of circumstantial evidence; but with the testimony of the

accomplice Carter there can be no doubt of the defendant's guilt. State v. Rowland, 72 Iowa, 327, 33 N. W. 137.

Remarks of counsel to the jury that defendant had introduced no evidence to show where he was on the night of the crime do not violate the statute, which provides that the refusal of the defendant to testify shall not be considered by the jury as evidence against him. State v. Ward, 61 Vt. 153, 17 Atl. 483, 8 Am. Crim. Rep. 207; Sutton v. Com. 85 Va. 128, 7 S. E. 323; Halleck v. State, 65 Wis. 147, 26 N. W. 572.

BRUCE, J. The defendant was convicted of the crime of grand larceny. The information charged that he stole one bay mare, eight years old, weight about 1,400 pounds, one black mare, six years old, weight about 1,400 pounds, one black gelding, five years old, weight about 1,050 pounds, one bay colt, three years old, and one sucking colt, from one F. E. Gereau on or about the 9th day of March, A. D. 1911. A reversal is sought upon the grounds: (1) That the verdict is against the evidence; (2) that the court erred in admitting a certain check in evidence; (3) because the state's attorney, in his address to the jury, asked the question: "Why hasn't he (the defendant) witnesses here to prove where he was on the night of March 9, 1911?" The defendant himself not having taken the stand; and (4) that the court erred in, himself and of his own motion, instructing the jury as follows: "The jury is instructed that in a criminal case the defendant need not take the witness stand, and because the defendant had not taken the witness stand in this case should not be permitted by you to prejudice him in any way. The failure of the defendant to testify is not even a circumstance against him, and no presumption of guilt can be indulged in by the jury on account of the defendant not having testified; and the jury are further instructed not to allude to this fact in their deliberations in arriving at a verdict."

One of the principal witnesses for the state was a man of the name of Carter, who was a confessed accomplice in the transaction. It is claimed that his evidence was uncorroborated, that the evidence as a whole failed to identify the horses which were alleged to have been stolen, and that the proof did not conform to the information. We do not believe, however, that any of these contentions can be sustained, but,

on the contrary, that although the evidence is mainly circumstantial it was sufficient to justify the verdict of the jury. The appellant, indeed, wishes this court to entertain "the reasonable doubt" when that matter was for the jury, and not for us. It is for us to pass upon the question as to whether there was evidence sufficient to justify a verdict of guilty if no reasonable doubt was entertained by the jury. The witness Gereau positively testified to the fact that he found a sucking colt and a three-year-old bay and a five-year-old black horse, weight 1,050 pounds, at Garden Plains, Illinois, and that these horses belonged to him and were grazing at or near Edgeley on or about March 9, 1909. These horses were described in the information as one black gelding five years old, weight about 1,050 pounds, one sucking colt, and one bay colt three years old, and although the other horses described in the information are not, perhaps, sufficiently accounted for, these three certainly are, and if there was evidence tending to show and from which the jury might find beyond a reasonable doubt that they were stolen by the defendant, the identification was certainly sufficient. The witness Carter, who was a confessed accomplice of the defendant, testified that on or about March 9, 1909, he helped the defendant to dispose of some horses, "a mixed bunch, some colts and some horses and some mares in the bunch, not more than one of them was with foal. They were of a dark color, brown and bays. One black, maybe." He also testified that he helped to ship these horses to South St. Paul and sold some of them to one J. B. Fitzgerald, "for a man in Illinois or Iowa or somewhere." This witness, it is true, is an accomplice, and his testimony should be corroborated, but this is certainly done. He testifies that the horses were stolen from the neighborhood of the farm of the complaining witness, and testifies to his whereabouts on that night, and the fact that he accompanied the defendant on some if not all of his missions, and went with him to secure some of the horses. "I know the defendant, Dodson," he said; "I was acquainted with him on March 9th. I met him at that time at Deisem. We went off south of Deisem to look for a horse that had broken away from us,—so he said—the day before. I do not remember seeing anybody but a boy. We might have met someone on the road. I am not sure. I do not know whose boy it was. After going south we went back to Deisem, and we then went to Edgeley. A traveling man was with us. Something took place that evening.

We had a deal on for some horses, and he (Dodson) was to go out and get them and bring them in to me. Dodson got a little horse that I had there and went out. It must have been about 8 o'clock. I cannot say what time. It was not very late. Dodson left the barn at that time on a saddle horse. There was around the barn that evening a man who worked there, and I don't know of anyone else but John Plott. After defendant left I got a saddle horse and went out to Boolby's pasture, between 9 and 10 o'clock. I looked to see if there was any horses in the pasture, and went back to Edgeley. Dodson was not there. I got back to Edgeley about 9 or 9:30. I laid down in a stall in the back of the barn about 11 o'clock. I went back to the barn and waited for Dodson. He got back about 2 o'clock. He told me the horses were in Boolby's pasture, about half a mile north of town. We stayed in the barn until about 4 o'clock, and went to my house and got breakfast. It was somewhere about that time. Dodson and I then took the horses to the Fradet barn. I shipped those horses to St. Paul. I should say it was around half past 5 o'clock in the morning when we arrived at the Fradet place with the horses. It was good daylight. After we arrived at this Fradet place, Dodson went back to Edgeley and I stayed there. He (Dodson) did not stay any length of time around the Fradet place. Just put the horses in the shed and went back on horseback. These were the horses I shipped. I shipped them from Berlin to South St. Paul, and sold them there. I know G. W. Stone and J. B. Fitzgerald bought two or three of the horses for a man in Illinois or Iowa. We talked about what should be done with the horses that night or morning, going out. It was agreed that I should sell them and divide the money. He got part of it, and I got into trouble and he did not get it all. He said he got hold of some horses without the permission of the owner and could sell them cheap. I knew these horses I got from Dodson were stolen horses. He said he had gotten them without the owner's permission."

A large portion of this testimony is corroborated, and as to material facts. The witness Sibley testifies that he saw Dodson and Carter in Deisem on March 9th. The witness Overlees testifies that he saw Dodson and someone with him about half a mile south of his place, and about 2 miles from Deisem; and that they claimed they were looking for horses; that they asked him if he had seen any horses with halters on. The witness Holta testifies that he saw Carter and the defendant on

the morning of March 9th, standing together, and again in the afternoon. The witness Plott testifies to seeing them at the livery barn with a saddle pony. The witness John Coop testifies that on the morning of March 10, 1911, Dodson came in early in the morning on horseback, and that his horse was sweaty and pretty tired. The witness Fortin testifies to practically the same facts. The witness Gilbertson testifies to seeing Carter standing in the barn door and seeing someone ride north at about 5 or 6 o'clock on the morning of the 10th. The witness Wilson testifies to seeing Dodson at the hotel on March 10th, but that he did not occupy his room in the hotel on that night. All this testimony is corroborative. It tends to show that both the defendant and the accomplice were in the vicinity of the place where the crime was committed at or about the time complained of, and concerning which the accomplice testified; that the defendant was seen by witnesses saddling a pony the evening before and again seen the next morning coming into the back of the livery barn with the pony very wet and sweaty; that he did not stay at his usual hotel on the night in question; that his conduct was suspicious; that he was a long way from home with no other ostensible business; that he was out looking at horses on the prairie the day before. All this evidence was corroborative on the main facts in issue and of the testimony of the accomplice.

It is not necessary that the corroborative evidence should cover every material point testified to by the accomplice, nor be sufficient in itself to warrant the verdict of guilty. If the accomplice is, by such testimony, corroborated as to some material fact or facts tending to connect the defendant with the commission of the offense, the jury may from that infer that he speaks the truth as to all. See State v. Reilly, 22 N. D. 353, 133 N. W. 914; 13 Cyc. 455; Bell v. State, 73 Ga. 572; People v. Mayhew, 150 N. Y. 346, 44 N. E. 971.

Nor do we believe that the introduction of the check in evidence was error. It was testified to by Carter as having been given as part of the purchase price of the horses. It is true that it was not given to him by the man with whom he placed all the horses for shipment to Illinois or Iowa, but it was a payment for part of the horses shipped to St. Paul. It was thoroughly explained in the evidence. It tended to prove the fact that Carter went to St. Paul and there sold the bunch of horses which he and Dodson had obtained in North Dakota. Its intro-

duction could certainly do the defendant no harm, as it was not pretended that it was given for any particular horses, but was "a part of the payment for horses Mr. Dodson delivered to Carter in Boolby's pasture, though some of his own horses were in it."

It is quite clear to us, also, that neither the remarks of the state's attorney as to the failure of proof of the whereabouts of the defendant on the night of March 9, 1911, nor the instructions given by the court in relation to the failure of the defendant to take the stand, constituted reversible error. We are aware of the fact that § 10,000, Rev. Codes 1905, provides that "in the trial of a criminal action or proceeding before any court or magistrate of this state, whether prosecuted by information, indictment, complaint, or otherwise, the defendant shall, at his own request and not otherwise, be deemed a competent witness, but his neglect or refusal to testify shall not create or raise any presumption of guilt against him, nor shall such neglect or refusal be referred to by any attorney prosecuting the case, or considered by the court or jury before whom the trial takes place." We are also aware of the fact that it has been held reversible error for the prosecuting attorney to refer to the fact that the defendant has not testified. State v. Williams, 11 S. D. 64, 75 N. W. 815; State v. Garrington, 11 S. D. 178, 76 N. W. 326; State v. Bennett, 21 S. D. 396, 113 N. W. 78; 12 Cyc. 576. The state's attorney, however, did not at first comment upon the fact, and any prejudice which may have arisen from his remarks can be traced to the objection of the defendant's counsel, which was improperly interposed. All that the state's attorney said, indeed, was, "Why hasn't he *witnesses* here to prove where he was on the night of March 9, 1911?" He did not ask why the defendant did not, himself, prove this fact, or why he was not upon the stand. Both his subsequent remark and the instruction of the court were made necessary by the objection, and were for the benefit of the defendant, and to secure him the protection of the rule, rather than to deprive him of it. By objecting to the remarks of counsel, defendant in effect asked either that the plaintiff's counsel be rebuked and his words be withdrawn, or that the jury be instructed to disregard them. The explanation of the state's attorney was a perfectly natural explanation. It was to the effect that "I am not talking about the defendant, but I am asking why he did not put *other witnesses* on to show where the defendant was on this

night." It is perfectly clear, indeed, that an *alibi* may be proved or disproved by other witnesses than by the defendant himself, and that the failure of such proof is a legitimate subject of comment. In calling the attention of the jury to the fact that the defendant had not accounted for his whereabouts on the night of the alleged theft, the state's attorney was not exceeding the limits of fair discussion, nor was he necessarily calling attention to the fact that the defendant had not, himself, taken the stand. We would even go further, and say that the rule should not be held to prevent the court from calling attention to the rule, and to the privilege of the defendant, if, in his opinion and discretion, it seems that the jury may be misled on the proposition; provided, however, that he makes it clear that nothing prejudicial to the defendant may be argued from his failure to appear and testify. Its purpose is to prevent the state's attorney from first calling attention to the matter or commenting unfavorably thereon. The fact would have been very different if the remarks of the counsel for the state had been improper in the first place, but they were not. There is such a thing, indeed, as refining a refinement too far, and of assuming an incompetency on the part of the jury, which, if true, should do away with the system altogether. We have a right to believe that a jury represents the ordinary intelligence of the community and the ordinary sense of fair play and obedience to the law of that community. To hold, indeed, that an instruction which is given in the spirit of the utmost consideration and fair play towards the defendant must necessarily prejudice the jury and constitute prejudicial error is, we believe, to go too far. We are sustained in this position by the language of this court which was used in the case of State v. Wisnewski, 13 N. D. 649, 102 N. W. 883, 3 Ann. Cas. 907, in which it was said: "The statute does not prohibit the court from mentioning to the jury the fact that the defendant has a right not to become a witness in the case, and it seems that no possible prejudice could follow from that fact when they were instructed that such fact should not be considered by them in their deliberations. It was an instruction favorable to the defendant. The state's attorney is prohibited to refer to it or mention it. A defendant's failure to become a witness might well be considered as a circumstance unfavorable to the defendant, and to advise them it shall not be so considered is not subject to prejudice or exception. 11 Enc. Pl.

& Pr. 352; State v. Weems, 96 Iowa, 448, 65 N. W. 387; Fulcher v. State, 28 Tex. App. 465, 13 S. W. 750; State v. Landry, 85 Me. 95, 26 Atl. 998."

We are not unmindful of the cases of State v. Carrington, 11 S. D. 178, 76 N. W. 326, and State v. Bennett, 21 S. D. 396, 113 N. W. 78, which are cited by counsel for appellant. In these cases, however, improper remarks were first made by counsel for the prosecution. They were not cases where the court instructed the jury upon the subject at issue out of solicitude for the defendant, and to avoid a misunderstanding arising out of mistaken zeal upon the part of his own counsel.

On a perusal of the whole record, we are convinced that there was sufficient evidence to sustain the verdict of the jury, and that no reversible error was committed.

The judgment of the District Court is affirmed.