[File No. Cr. 164.]

THE STATE OF NORTH DAKOTA, Respondent, v. LEO FOSTER, Appellant.

(287 N. W. 517.)

Opinion filed September 13, 1939.

*F. T. Cuthbert,* for appellant.

*Alvin C. Strutz,* Attorney General, and *E. C. Boostrom,* State's Attorney, and *Olaf M. Thorsen,* former State's Attorney, for respondent.

MORRIS, J.  Leo Foster appeals from a judgment of conviction for the crime of grand larceny.  He is charged with stealing a leather pocketbook of the value of fifty cents and its contents of $29.40 in money from one James Anderson.

On March 4, 1935, the complaining witness, who lives in southern Nelson county, went to Lakota and took with him one Leonard Walhood.  Walhood had no money.  While at Lakota he borrowed $1 from Anderson and spent it for food and beer.  Walhood obtained three one hundred pound sacks of potatoes from the relief office in Lakota.  He and Anderson started home about 4 o'clock in the afternoon.  They stopped at a place known as the Cave about eight miles south of Lakota, at the suggestion of Walhood, who wanted to get a bottle of beer.  The defendant, Foster, who was in charge, and two other men were there.  Walhood continually urged Anderson to buy beer.  He also borrowed

fifty cents more from Anderson who wanted to continue on home, but Walhood wanted to stay. Walhood went out and let the air out of three tires on Anderson's car. While Anderson was pumping up the tires Walhood took the keys out of the car. He then told Anderson that Foster would treat them to some beer before they went home. After pumping up the tires Anderson went in for the beer. While he was in drinking beer someone tore the electrical wires from the distributor and from the spark plugs, so that when Anderson came out again he could not start the car. Walhood says that Foster suggested tearing the wires away and helped in carrying out the suggestion. Anderson then sat in the car for a while waiting for someone to come along with whom he might catch a ride. Later he was called into the Cave and invited to stay all night. The building consisted of a bedroom, a dance hall, and a kitchen. A cot was pulled out into the dance hall where Walhood and Anderson slept. Foster and the two other men, Brooker and Zimmer, slept on the bed in the bedroom. Anderson was sick during the night. At one time he woke up and someone was bending over the cot. Walhood was lying beside Anderson. Walhood asked what was the matter and the figure bending over him said he was looking for a smoke. Anderson did not recognize this person. The lights were off and it was dark. When Anderson went to bed he put his pocketbook containing $29.40 under his pillow. When he woke up in the morning it was gone. He immediately made known his loss and looked for the pocketbook, but none of the other men helped him look for it, and no one seemed to display any interest in his misfortune. Foster and Walhood went into the kitchen together and conversed in low tones.

Walhood frankly tells a sordid story. During the evening he sold all of his relief potatoes to Foster for $1.50 and used the money to buy beer. He drank up this money by about 10 o'clock, and went to bed alongside of Anderson. After awhile he woke up and was thirsty again. He got up and asked Foster for more beer. Foster refused to let him have it unless he had the money. He says that Foster urged him to get Anderson's pocketbook. He found the pocketbook lying in the bed alongside of Anderson. He took the pocketbook to Foster who kept a twenty dollar bill and gave $9.40 to Walhood. Foster then threw the empty pocketbook into the stove. Walhood continued to buy

and drink beer most of the night. He insisted on drinking bottled beer and after drinking part of the bottle he would think the rest was stale and would buy a fresh full bottle. In the morning Anderson called the sheriff who came out from Lakota and searched Walhood but found only some small change on him. Walhood later confessed. In the trial of this case he was the chief witness for the state. According to his statement he and Foster were accomplices. Upon this appeal the defendant contends that he was convicted upon the uncorroborated testimony of Walhood, a confessed accomplice, and that, therefore, the conviction cannot stand.

He relies upon § 10,841, N. D. Compiled Laws 1913, which provides, "A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

This section has long been a part of our Code of Criminal Procedure and has been construed in a number of cases in connection with various facts. In State v. Kent, 4 N. D. 577, 62 N. W. 631, 27 L.R.A. 666, it is said that, "The corroboration, to satisfy the statute, must come from some independent source, and must tend to connect the accused with the crime. Mere corroboration as to immaterial matters testified to by the accomplice, or as to the fact that a crime had been committed; or as to the connection of the accomplice therewith, or as to all these combined, will not suffice. The rule is very accurately stated in People v. Plath, 100 N. Y. 590, 3 N. E. 790, 53 Am. Rep. 236: 'There must be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference, not only that a crime has been committed, but that the prisoner is implicated therein.' It is not necessary that such corroborating evidence be sufficient, of itself, to warrant a conviction. The requirements of the statute making it necessary to corroborate the testimony of an accomplice are met if the evidence tends to connect the prisoner with the commission of the crime."

In State v. Coudotte, 7 N. D. 109, 72 N. W. 913, it was held that the testimony of two accomplices that the defendant participated in the murder of one Thomas Spicer was not corroborated by evidence that

defendant and another accused were seen together on horseback two or three hours after the murder, the accomplices having testified that the defendant and the other accused rode away from the scene of the crime together in the direction of the place they were later seen, and the court remarked, "In order that this testimony should show any force whatever as corroborating testimony, it is necessary to include the portion given by the accomplices. In other words, the accomplices must be permitted to corroborate themselves. This is utterly untenable."

.. The corroboration required by the statute, while it must tend to connect the defendant with the commission of the crime, does not require that every material fact testified to by the accomplice must be corroborated by independent evidence, or that the corroborating evidence standing alone must be sufficient to support a verdict of guilty. State v. Marcovitz, 63 N. D. 458, 248 N. W. 481. The corroboration may be by facts and circumstances as well as by direct evidence. State v. Todd, 62 N. D. 479, 244 N. W. 25. It is also a well-settled rule in this state that if the testimony of the accomplices is corroborated as to some material fact or facts tending to connect the defendant with the commission of the crime, the jury may infer therefrom that the accomplice speaks the truth as to all. State v. Reilly, 22 N. D. 353, 133 N. W. 914; State v. Dodson, 23 N. D. 305, 136 N. W. 789; State v. Smith, 51 N. D. 130, 199 N. W. 187. The general rules as to the corroboration of an accomplice are fairly well defined and authority in support thereof is abundant. The application of these rules is much more difficult than their statement. Clearly the state is not required to prove by evidence aside from that of the accomplice that the defendant is guilty beyond a reasonable doubt. It is not even necessary that such evidence establish a prima facie case, but the statute clearly requires that in order to convict there must be evidence other than that provided by the testimony of the accomplice which "tends to connect the defendant with the commission of the offense." The statute then specifically provides that "the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

The state points to various items of independent testimony which it contends furnish sufficient corroboration to support this conviction. There were only a few bottles of beer drunk before the parties went to bed. In the morning there were many bottles strewn about the floor.

Zimmer, Brooker and Foster all slept in the one bed in the bedroom. Foster was on the outside and, therefore, was in the most convenient position to get up without waking the others. Foster testified that he went to bed about 10:30 in the evening and slept until morning. In the morning after the robbery had been discovered, Foster stated that there had been two men down in the Cave during the night and that the robbery might have been committed by them. These two men seem to have been mythical since no one else appears to have seen them, and Foster, according to his own testimony, slept from 10:30 at night to 7:30 the next morning when he and Brooker got up at the same time. The testimony of Foster as to the time he slept is, to say the least, wholly inconsistent with his story of the two men who were in the Cave during the night. It is also at variance with the testimony of Anderson, who testified that when he became sick during the night he asked Foster for a pail in which to vomit and that Foster told him where to find it. It is of importance to note that Foster who had not theretofore been furnishing beer unless it was paid for, was willing to treat Anderson to free beer as soon as the deflated tires had been pumped up and that it was during the time that Anderson was being entertained in the Cave that the car was further disabled and Anderson thus prevented from leaving the premises. Foster showed no surprise or concern when he was told about the robbery, yet was seen to go into the kitchen shortly after the discovery and converse in low tones with Walhood. The fact that Walhood apparently had little money the next morning may be considered as having some bearing in support of his story. There is, of course, no question as to Foster's presence and opportunity to participate in the commission of the crime. Anderson had his pocketbook out a number of times during the evening and had at least one bill changed. Moreover, Walhood continually solicited the purchase of beer by Anderson. Foster knew that Anderson had a considerable sum of money in his pocketbook and that Walhood had none.

It should be noted that our statute does not require corroborating evidence to connect the defendant with the crime, but merely that it tends to do so.

"The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient cor-

roboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test." Wharton, Criminal Evidence, 11th ed. § 753.

The weight of the corroborating evidence is for the jury. It is only when there is no corroborating evidence of the nature required by § 10,841, N. D. Compiled Laws 1913, that this court may reverse a judgment based upon a verdict of guilty. When all of the corroborating evidence in this case is taken together as it should be, it tends to connect the defendant with the commission of the crime, and is sufficient to support the verdict. We cannot say that as a matter of law the requirements of the statute have not been met.

Affirmed.

NUESSLE, Ch. J., and BURR, J., concur.

BURKE, J. (dissenting). I do not agree that there is evidence in this case sufficient under the statute to corroborate the testimony of the accomplice Walhood.

The evidence, to be sufficient, must tend to connect the defendant with the commission of the offense and it must come from a source entirely independent of the accomplice. State v. Coudotte, 7 N. D. 109, 72 N. W. 913. The evidence, which it is asserted corroborates the accomplice, is all circumstantial. Two principal circumstances are urged as being sufficient to justify an inference of the defendant's connection with the commission of the offense. The first of these is, that the defendant, upon being told of the crime immediately fabricated a story in which he placed the blame upon fictitious persons; the second is that the defendant, upon hearing that a pocketbook had been stolen, withdrew with the accomplice from the rest of the group at the "Cave" and went with him into the kitchen where he conferred with him secretly. It might be that these circumstances would be sufficient, if proved, to justify an inference of the defendant's connection with the commission of the offense, but, in my opinion, these circumstances or facts have not been established. In this case, not only is the ultimate conclusion of defendant's connection with the commission of the offense dependent upon circumstantial evidence, but the circumstances upon

which that ultimate conclusion is founded are in their turn also dependent upon circumstantial evidence. While it is true that the ultimate conclusion need only be that the facts proved tend to show the defendant's connection with the commission of the offense, the facts upon which that conclusion rests must be positively established. When these facts in turn depend upon circumstantial evidence the inference of such facts must not only follow as logical conclusions from the circumstances proved but must also follow as the only reasonable conclusions. Jones, Commentaries on Evidence, § 364.

The fact that the defendant falsely placed the blame for the theft upon fictitious persons can be inferred only from the witness Anderson's statement that "he (the defendant) said a couple of fellers been down there in the night and they might have my pocketbook" and the defendant's statement that he slept all night. It is said, that since the defendant slept all night, he could not know whether strangers had been there in the night or not, and that the story is therefore pure fiction. The defendant, however, did not say that he saw or heard the strangers, he simply said there were strangers present. He did not explain how he learned of their presence, nor was he asked to explain. Other evidence in the case points to the truth of his statement. The witness Brooker testified:

"Q. Did you waken before morning?

"A. I didn't waken only to the extent to remember somebody went out and came in again, or came in and went out, because the door opened and shut.

"Q. The outside door?

"A. The outside door.

"Q. You at that time saw Leo (the defendant) and Zimmer both in bed with you?

"A. Yes, they were both in bed with me."

The other two persons present in the Cave that night, Anderson and Walhood, both testified that they stayed in the building all night. Thus none of the five, who were rightfully in the building that night was responsible for the opening and closing of the outside door. The defendant and Brooker had slept together, they got up at the same time, and normally Brooker's first subject of conversation would have been to mention what he had heard in the night. It would have been most

unusual if the defendant, having heard of the presence of strangers, had not mentioned it when he learned that a pocketbook had been stolen. Even if it is assumed that the jury wholly disregarded the testimony of Brooker, although it is uncontradicted, that testimony nevertheless pointedly shows that Anderson's testimony as to what the defendant said, and defendant's testimony that he slept all night, may be reasonably reconciled and that the inference that defendant attempted to place the blame on fictitious characters is not justified.

The fact that the defendant and the accomplice, Walhood, withdrew to the kitchen and conferred secretly can be inferred only from the following testimony of the witness Anderson. "Q. Did Foster and Walhood do anything else that morning that you noticed? A. Why, in the morning when I got up and said my pocketbook was gone, Foster and Walhood went out in the kitchen, and they kind of talked, they were talking kind of low. I didn't hear what they were talking about." Anderson did not testify that either Walhood or the defendant called the other to the kitchen or that they went to the kitchen together. The witness Brooker testified:

"Q. What was Walhood and Anderson doing when you and Leo (the defendant) got up? A. When I got up Anderson was walking around on the dance floor looking for his purse. . . .

"Q. Did you go out before Leo did? A. I don't think I did. We just about finished dressing at the same time and walked out, and Walhood was in the kitchen, in what we called the kitchen. . . .

"Q. What was Walhood doing? A. I don't know what he was doing. I don't know whether he was eating or ——."

The Cave was in the business of serving lunches as well as beer. The defendant, the record shows, was acting for the proprietor. It seems to me that the only reasonable inferences that may be drawn from this testimony are that the defendant went to the kitchen to see what Walhood, who had no right there, was doing, or that he went to prepare breakfast. Having gone to the kitchen, there is nothing unusual in the fact that he talked to Walhood, or that he talked to him in tones that could not be heard in another room. It is very doubtful if the witness Anderson would have heard them, had they shouted, for at the time, he, according to his own testimony, was searching the dance hall for his pocketbook. Again if it is assumed that the jury disregarded

Brooker's testimony and that Anderson's statement that Foster and Walhood went to the kitchen means that they went together, there is still no justification for any inference other than that they went into the kitchen to prepare breakfast, for someone did prepare breakfast. Anderson testified, "Q. Well, did you have breakfast there that morning? A. I had a little, but I couldn't eat much."

The other circumstances which it is claimed corroborate the accomplice, all, to some extent at least, depend upon the testimony of the accomplice himself and are not "other evidence" such as is contemplated by the statute. State v. Kent (State v. Pancoast) 5 N. D. 538, 67 N. W. 1052, 35 L.R.A. 518; State v. Coudotte, 7 N. D. 109, 72 N. W. 913, supra.

The judgment should be reversed.

I am authorized to state that Judge Christianson agrees with the views here expressed.