

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR–15–696

| | |
|---|---|
| | **OPINION DELIVERED** APRIL 20, 2016 |
| JAMES NELSON ENGLAND<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTH DIVISION<br>[NO. 60 CR–2014-1732] |
| V. | HONORABLE HERBERT THOMAS WRIGHT, JUDGE |
| STATE OF ARKANSAS<br>APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Chief Judge

James England appeals his conviction of rape and incest, arguing that the Pulaski County Circuit Court committed reversible error by permitting the State to introduce testimony and evidence of his alleged suicide attempt. We affirm.

### I. *Facts*

England was charged by felony information on December 19, 2012, with rape and two counts of incest based on the allegations of his two stepdaughters. It was alleged that these acts occurred between January 1, 2009, and August 31, 2011, during which time one stepdaughter was under the age of eighteen. On May 4, 2015, England filed a motion-in-limine seeking, among other things, a prohibition on the State from introducing any testimony regarding a photograph of him with what appeared to be a noose around his neck, the photograph itself, and any evidence of suicidal ideations or attempts by him.

SLIP OPINION

In response to the motion, the State argued that it expected to present testimony that England was manipulative and controlling. England's stepdaughter, Samantha Barnes, was expected to testify that England had texted her the picture of himself with a noose around his neck and that England said that he intended to kill himself after she moved out of his residence. The State argued that this was relevant because each victim had delayed in reporting the sexual activities that took place because of the threats, manipulation, and intimidation by England.

At the pretrial hearing on England's motion, the trial court ruled that the photograph of England with the noose around his neck was inadmissible unless the defense "opens the door." However, any of the statements that England had made to the victims were "fair game."

Lindsay Bean, born January 4, 1992, testified at trial that England was her stepfather, her mother, Peggy Stane, married England when she was six years old, and they had divorced in January 2015. She said that during the time her mother was married to England, he was like a father to her and her siblings Kelly Lovell, Samantha Barnes, and Brent England, who was the only biological child of England and Peggy. She said that England was the disciplinarian and controlled what she did at school and on weekends. She said that when she turned seventeen, she traveled with him in his semi-trailer to haul cows out of town. She testified as follows:

> At that time we were in the sleeper and he got on top of me, and he tried to do things with me and I said no. I asked him to get off me, and he stopped. We got in the cab of the truck. We started driving again, I don't know how long after that but we stopped again on the same day and he laid down. We laid down again and he

got on top of me. And that's when he pushed my panties aside and he penetrated me. It wasn't very long, and he got up, and I didn't really realize what was happening until I felt blood putting my clothes back on.

Lindsay testified that she had sexual intercourse with England about 400 times. She said that if she did not do what he asked, he would be in a bad mood. She stated that there were a lot of times "we didn't say no," so she did not know what he would have done if she had refused him, but she claimed that it was just the thought of what he would do or how he would act that propelled her to allow it.

Peggy Stane testified that she had been married to England, and her daughters were his victims. She testified about England's work history and said that the girls "went on the road with him" when he drove his truck, sometimes together and sometimes individually. Peggy said that Lindsay told her that England had been having sex with her but that she did not want to believe it. She asked Samantha if anything ever happened between her and England, and Samantha denied it at first, but she later told Peggy that it had happened. Peggy said that, at the girls' request, she did not contact police. She said that when she finally confronted England, he denied it, but then said, "It wasn't my fault. They initiated it." She stated that England had a temper and that he became very controlling and then fervently abusive during their marriage. She claimed that he had threatened to commit suicide more than once.

Samantha testified that she was born on August 22, 1985, and that her mother Peggy had been married to England. She said that England was the disciplinarian and had set the rules. She said that England treated her as a wife, and the sexual relationship between them started in 2001 just after she turned sixteen, and that it continued until August 2011. She

said that she was the caretaker for England's mother, who moved in with them in 2007 and died in 2010. Therefore, during 2009 and 2010, Samantha primarily took care of England's mother. She said that during this time, while everyone else was at work or school, she and England would have intercourse.

Samantha explained that she got a job at the OK Corral Western Store and that England would be jealous of any male attention she received from customers. In October 2011, she was invited to the movies by her coworkers. She called England to ask if she could go, and he told her that she had to bring home the car she had driven to work. She said that she dropped it off and left again with her friend without telling England. While she was in the movie, England "bl[ew] up her phone," and demanded to know where she was. He told her that he was going to beat her when she left the movie. She went home with her friend that night and never went back to England's house to live. She stated that England asked her to come back home and that he had threatened to kill himself and everyone in her family.

Debbie Keathley testified that she owned the store where Samantha worked. Keathley stated,

> The day she told me he was coming to the store, he confessed to me on the phone about an improper relationship with Sam[antha]. He had called the store several times that day. Earlier that day is when he had told her he was coming in. She wouldn't answer her cellphone or the store phone. So he finally called so many times that other employees were answering it till I got on the phone. For whatever reason, he    would tell me about it. That they had more than a father-daughter relationship. I told him that if he was telling me this to shame Sam[antha], he was only making himself look bad. He started going into this story about how she owed him. I told him it sounded like he bought the mobile home more for his

convenience than hers. He got mad and threatened to come and take care of all of us.

Cleo England, Danny Lawson, and Kenny Munn each testified that they had never witnessed anything inappropriate between England and Samantha or England and Lindsay. Dr. Kevin Claybrook testified that England was his urology patient. He explained that England had erectile dysfunction, and he had treated England for prostate cancer. He said that England had surgery in June 2010 and that he had a fairly rocky post-op course with lots of chronic pain, problems with depression, and fairly significant problems with a diminishment of sexual desire and erections. He opined that the amount of sex that had been alleged in this case seemed inconsistent with England's complaints. He said that in order to have sex as many times as was testified to, England's libido would have to have been significant, and his problems had been with low libido, low testosterone, and erectile dysfunction.

England testified regarding his work history and his life with Peggy and their children. He denied ever having touched Samantha or Lindsay. On cross-examination, England denied threatening to hang himself with an electrical cord, and he denied texting a photograph to Samantha after he threatened to hang himself. No objection was made when the State elicited this testimony from England.

Samantha was called by the State as a rebuttal witness, and England's attorney objected, stating,

> Your Honor, we're gonna, we're gonna object to this rebuttal witness. I'm assuming this is about the photograph, and, again, I'd like to renew my objections that the

photograph is not in any way, or form, or fashion reliable. There's no, there's no time date. There's no, anything about it. I mean, we just have a picture of him.

The trial court allowed the State to lay a foundation for the picture through the witness, and Samantha testified that shortly after she left home in October 2011, England had contacted her and threatened to commit suicide and said that he could not live without her. He texted her a picture of a cord or rope from a tree or deer stand that was fastened around his neck. She emailed it to herself, saving it to her computer. The photograph was identified and admitted into evidence over England's objection. England then testified, denying that he was trying to kill himself that day. He said that he took the picture and sent it to his wife, not Samantha.

The jury found England guilty on all counts and sentenced him to concurrent terms of imprisonment in the Arkansas Department of Correction—fifteen years on the rape charge and ten years on each incest charge. This appeal timely followed.

## II. *Applicable Law*

Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Conte v. State*, 2015 Ark. 220, at 26, 463 S.W.3d 686, 702.

> This court rejects the admission of inflammatory evidence where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *See Camargo v. State*, 327 Ark. 631, 637–38, 940 S.W.2d 464, 467 (1997) (holding that we require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value*); see also Beed v. State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403.

SLIP OPINION

> Evidence is admissible if it tends to shed light on any issue, to corroborate testimony, or if it is essential in proving a necessary element of a case, is useful to enable a witness to testify more effectively, or enable the jury to better understand testimony. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994).

*Id.*, 2015 Ark. 220, at 34, 463 S.W.3d at 706.

### III. *Admissibility of Evidence*

England argues that the trial court committed reversible error by permitting the State to introduce testimony and evidence of his alleged suicide attempt. He contends that the testimony concerning the suicide attempt had limited, if any, probative value in a case where the issue was whether he had sexually abused his stepdaughters. He claims that there was an enormous risk of unfair prejudice based on the alleged suicide attempt. Ark. R. Evid. 403 (2015). He contends that courts in other jurisdictions have looked at the issue of whether suicide attempts are admissible and claims that, largely, their decisions rest on whether there truly was a suicide attempt and whether there was evidence that the suicide attempt was in response to the charge or investigation, citing *Kien v. State*, 782 N.E.2d 398 (Ind. App. Ct. 2003); *State v. Mann*, 625 A.2d 1102 (N.J. 1993); *Pettie v. State*, 560 A.2d 577 (Ct. App. Md. 1989); and *State v. Coudotte*, 72 N.W. 913 (N.D. 1897). England argues that, similar to the cases cited, the alleged suicide attempt here was not a real one. He contends that there was no confirmation that he had actually attempted suicide. More importantly, he claims that there was no connection between the alleged suicide attempt and any sexual relationship he had with his stepdaughters. He asserts that the alleged attempt was prior to any investigation or charge. Thus, he claims that the inherent risk of unfair prejudice substantially outweighed the probative value of the evidence.

The State maintains that England's argument has no merit, and this court agrees. The testimony that was elicited from Peggy, Lindsay, and Samantha evidenced how much control and manipulation England had over their lives and included repeated threats to kill himself in order to get them to behave in ways that he wanted. Samantha testified that he had texted her a picture of himself with an electrical cord wrapped around his neck and that he had said that he was going to end it because he could not live without her. As further argued by the State, the evidence was introduced, not to show his unwillingness to endure prosecution, but to show the level of control and manipulation his victims faced. Further, the photograph and testimony of his hanging attempt were introduced by the State through its rebuttal witness after England, on cross-examination, without objection, denied attempting suicide and sending the picture. England's objection to the introduction of the photograph was not that the picture's admission was violative of the circuit court's order in limine, but the objection was related only to the reliability of the photograph. Pursuant to the objection, the circuit court properly required that a foundation be laid, and the State complied.

> The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *E.g.*, *Laswell v. State*, 2012 Ark. 201, at 17, 404 S.W.3d 818, 828. The abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *E.g.*, *Grant v. State*, 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004). In addition, we will not reverse a ruling on the admission of evidence absent a showing of prejudice. *E.g.*, *Davis v. State*, 350 Ark. 22, 38, 86 S.W.3d 872, 882 (2002).

*Maiden v. State*, 2014 Ark. 294, at 4, 438 S.W.3d 263, 268.  In light of the circuit court's ruling on England's motion in limine, we hold that there was no abuse of discretion in admitting the evidence.

Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Priest*, Ass't Att'y Gen., for appellee.